AGENCY OF CANADIAN CAR & FOUNDRY CO., Limited, et al. v.
AMERICAN CAN CO.

(Circuit Court of Appeals. Second Circuit. April 21, 1919.)

No. 148.

1. AMBASSADORS AND CONSULS ☞5½, New, vol. 8A Key-No. Series—AUTHOR-
ITY OF GOVERNMENT REPRESENTATIVES—CHANGE OF GOVERNMENT.
    The Russian Supply Committee in America, created in 1915 to have
charge of the purchase of supplies and munitions for the Russian govern-
ment, certified in 1917 by the recognized Russian ambassador to have
power to act in that behalf, *held* to have authority to make a settlement
of contracts relating to purchase of munitions.

2. CONSTITUTIONAL LAW ☞68(1)—RECOGNITION OF FOREIGN GOVERNMENT.
    Who is the sovereign de jure or de facto of a country is a question
for the political department of the government, and the decision by that
department in this country is conclusive upon the courts.

3. INTERNATIONAL LAW ☞9—EFFECT OF CHANGE OF GOVERNMENT.
    The rights and liabilities of a state are not affected by a change in the
form or the personnel of its government, however accomplished.

4. INTEREST ☞37(1)—RATE—CONTRACT FIXING RATE "TO DATE OF PAYMENT."
    An agreement to pay interest at a specified rate "to the date of pay-
ment of the amount" means to the date of actual payment, and not to
the date when payment should have been made, and the contract rate
governs to the date of entry of judgment or decree in equity for the
amount.

5. INTEREST ☞46(1)—RIGHT TO INTEREST—MONEY WRONGFULLY WITHHELD.
    Where different claimants to an admitted indebtedness of defendant
made a valid settlement of their differences, fixing the part due each,
which settlement defendant refused to recognize, in the absence of any
agreement respecting interest, defendant *held* chargeable with interest
at the legal rate from the date of demand after the settlement.

Appeal from the District Court of the United States for the South-
ern District of New York.

Suit in equity by the Agency of Canadian Car & Foundry Company
Limited, and the Recording & Computing Machines Company, against
the American Can Company. Decree for complainants, and defend-
ant appeals. Modified.

For opinion below, see 253 Fed. 152.

This cause comes here on appeal from a decree entered in the United States
District Court for the Southern District of New York, on August 14, 1918.
The Agency of Canadian Car & Foundry Company, Limited, hereinafter call-
ed the "Agency Company," is a corporation organized under the laws of the
state of New York, and is a citizen of that state, having its principal place
of business in the city of New York. The Recording & Computing Machine
Company, hereinafter called the "Recording Company," is a corporation or-
ganized under the laws of the state of Ohio, and is a citizen of that state,
having its principal place of business in the city of Dayton, in that state.
The American Can Company is a corporation organized under the laws of
the state of New Jersey, and is a citizen of that state, having its principal
place of business in the city of New York. The Canadian Car & Foundry
Company, Limited, hereinafter referred to as the "Canadian Company" is a
corporation under the laws of the Dominion of Canada.

On respectively, February 27, 1915, and March 8, 1915, two contracts were
entered into at Petrograd, Russia, between the Chief Artillery Board of the

Russian government and the Canadian Company. The first contract was for 2,500,000 high explosive shells and 500,000 shrapnel shells. The second contract was for 2,000,000 shrapnel shells. The 2,500,000 shrapnel shells so contracted for required 2,500,000 time fuses. This caused the Canadian Company in March, 1915, to enter into a contract with the Recording Company, in which the latter company agreed to manufacture for the former company 2,500,000 time fuses. In pursuance of these contracts the Russian government, through its attorney, advanced to the Canadian Company between April 20, 1915, and November 8, 1915, $9,904,997.

In October, 1915, there was organized the Russian Supply Committee in America, which took charge on behalf of the Russian government of all matters arising out of the contracts; and between November 22, 1915, and January 5. 1917, the attorney for this Committee, acting under its instructions, turned over to the Canadian Company, on account of the purchase price stipulated in the contracts, various amounts aggregating $64,000,000, which with the advances made prior to November 22, 1915, aggregated $74,000,000. On March 8, 1916, the contract of February 27, 1915, and the contract of March 8, 1915, were amended, and as amended were assigned with the consent of the Russian government to the Agency Company. After March 8, 1916, the performance of the contracts was carried on exclusively by the Agency Company.

Under date of August 23, 1916, an agreement was made between the Recording Company and the defendant for the manufacture by the Recording Company of 1,250,000 "22-second Russian combination fuses." Under date of October 31, 1916, an agreement was made between the Agency Company, the Recording Company, and the defendant, whereby the Agency Company waived any claim or lien which it had upon the time fuses manufactured by the Recording Company for the defendant under the contract of August 23, 1916. In the contract of October 31, 1916, the defendant agreed to pay to the Agency Company $1 of the purchase price of each fuse delivered "until all sums which may now or hereafter be due from and payable" by the Recording Company to the Agency Company should be adjusted or otherwise satisfied. This agreement is one of especial importance in this case. The Agency Company claimed that as a result of the dealings between the Recording Company and itself the latter was indebted to it in a large amount, and under date of November 17, 1916, what is known as the "Arbitration Agreement" was entered into between these two companies. They therein agreed to adjust and settle all accounts and claims arising under the agreement between them.

On January 2, 1917, the Agency Company assigned, among other things, to the Chief Artillery Board of the Imperial Russian government, which was referred to in the assignment as "the government," "all debts, accounts, and sums of money now due and owing, or accruing due from the manufacturer to the Agency Company up to, but not in excess of," $2,352,315.63. The agreement also assigned to the (Russian) government the agreement of October 31, 1916, "with full right and authority on the part of the government to receive from the American Can Company all sums of money payable to the Agency Company under the terms of said agreement." And the agreement expressly provided that the government would pay to the Agency Company "the aggregate amount of the sum or sums that may now be due or hereafter ascertained to be due or accruing due from the manufacturer to the Agency Company, under the terms of said agreements first above referred to, and to make such payments to the Agency Company as and when such sums respectively are ascertained, or are admitted by the manufacturer to be due or accruing due: Provided, however, that the government shall not be liable to pay any sum or sums due or accruing due from said the Recording & Computing Machines Company in excess of the aggregate amount of two million three hundred and fifty-two thousand three hundred and fifteen dollars and sixty-three cents ($2,352,315.63), and that for any sum or sums due or hereafter accruing due from the manufacturer to the Agency Company, in excess of the amount paid by the government in respect thereof, the Agency Company shall retain its rights to receive payment for the same from the manufacturer and the said Ohmer: And provided, also, that the rights of the

Agency Company to issue execution on any judgment recovered by it against the manufacturer and/or the said Ohmer in respect of the same shall not be exercised by the Agency Company until after the government has been reimbursed by the manufacturer and the said Ohmer for any and all sums paid and/or credited to the Agency Company hereunder, nor until all contracts which the manufacturer now has or may hereafter have for the manufacture of Russian time fuses have been completed by the Recording & Computing Machines Company."

On January 11, 1917, the Recording Company agreed with the Russian government that each firm or corporation having a contract with it for time fuses (including thereby the defendant) should deduct $1 from the purchase price of each fuse and pay the same to the government until payment should be made in full of the amount which the government was required to pay to the Agency Company under the agreement referred to in the preceding paragraph. On September 14, 1917, the defendant by letter acknowledged that it held $1,500,000 (or $1 per fuse upon the fuses manufactured for it) for account of the Agency Company or the Imperial Russian government as their interests might appear, and it agreed to retain the same "until such time as there shall have been made a final settlement and adjustment of accounts" between the parties interested, to wit, the Recording Company, the Agency Company, the Imperial Russian government, and the defendant, "or until their interests shall be finally determined by law." The agreement of September 14, 1917, also contained an important agreement as to the payment of interest, to which more specific reference is made in the court's opinion.

On December 18, 1917, an agreement was made between the Agency Company, the Recording Company, and the Russian government acting through Gen. Khrabroff, the president of the Russian Supply Committee in America, which it is claimed was a complete and final settlement, adjusting and determining all matters of account including the amount due from the Recording Company to the Agency Company; and on that day the Recording and Agency Companies by a separate instrument stated and adjusted their accounts, and the Recording Company conveyed to the Agency Company an interest, constituting a prior claim, to the extent of $713,176.07 in the fund of $1,500,000 held by the defendant; and on the same day last above named the Russian government assigned to the Agency Company and to the Recording Company all its right, title, and interest either in law or in equity in and to the sum of $1,500,000, and such interest as may be payable thereon, held by defendant, in such proportion that the Agency Company "shall have and enjoy the sum of $713,176.07 out of said moneys and the Recording Company shall have and enjoy the balance of $786,823.93 of said moneys and such interest as may be payable upon said moneys to be divided equally between said companies."

This suit is brought to compel the defendant to pay to the plaintiffs the moneys which they claim are improperly withheld from them by the defendant. The defendant admits that it is indebted in the amount of $1,500,000, and declares that it has been ready and willing to pay the same as soon as payment thereof would relieve it from possible liability to pay the same again in whole or in part to some other claimant or claimants. The defendant denies that the governments referred to in the various averments of said bill of complaint as "the Russian government" were the same governments; and it declares that it is without knowledge whether any rights or property alleged in said bill of complaint to have been acquired or vested in any Russian government have been acquired or vested in any other or subsequent Russian government in said bill of complaint mentioned, or in the complainants, or either of them, or whether any person, natural or corporate, or persons or body of persons, referred to in said bill of complaint or in any exhibit thereto as acting or purporting to act on behalf of any Imperial Russian government or any other Russian government had authority or power to so act. The court below has entered a decree in favor of complainants.

Simpson, Thatcher & Bartlett, of New York City (Graham Summer, of New York City, of counsel), for appellant.

T. Ludlow Chrystie, of New York City (Arnold Wainwright, K. C., of Montreal, Can., and Francis K. Raynor, of New York City, of counsel), for appellee Agency of Canadian Car & Foundry Co., Limited.

Walter C. Noyes, of New York City (H. A. Toulmin and H. A. Toulmin, Jr., both of Dayton, Ohio, of counsel), for appellee Recording & Computing Machine Co.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the above facts). This is a suit in equity brought for the recovery of $1,500,000 with interest. The general rule of course is that, where the cause of action is for the payment of a sum of money merely, there is no reason why a court of equity should be resorted to. Raton Waterworks Co. v. Raton, 174 U. S. 360, 19 Sup. Ct. 719, 43 L. Ed. 1005. An action at law is regarded as the appropriate remedy in such cases; the remedy at law being full, adequate, and complete. The Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1163) in section 267 (Comp. St. § 1244) expressly declares that suits in equity shall not be sustained in any court of the United States in any case where a plain, adequate, and complete remedy may be had at law. The bill of complaint in this case, however, alleges that the plaintiffs have no adequate remedy at law and that the fund which they seek to recover is held by the defendant in trust. Whether there is or ever has been a specific trust res, or anything more than an ordinary indebtedness, payment of which the plaintiffs might have obtained in an action at law, and whether such an action would have been fully adequate, has not been raised by motion or answer, or on the argument. We observe, however, that counsel for defendant states in his brief as a fact that "there is no fund in a proper sense; there is merely an indebtedness of $1,500,000 owing by the defendant." Although an appellate court may, and not infrequently does, sua sponte, take the objection and dismiss the bill (Southern Pacific R. R. Co. v. United States, 200 U. S. 341, 26 Sup. Ct. 296, 50 L. Ed. 507), it will not in all cases pursue that course. We see no reason why in the present situation we should enter upon that inquiry, but we will assume that, if the plaintiffs are entitled to the money for which they have filed their bill, they may maintain their suit in a court of equity.

We may, however, add that the complainants derive through an assignment, and that the assignee of a chose in action under the decisions of the Supreme Court cannot proceed in equity merely on the ground that his interest is an equitable one, but must proceed at law. New York Guaranty Co. v. Memphis Water Co., 107 U. S. 205, 2 Sup. Ct. 279, 27 L. Ed. 484; Hayward v. Andrews, 106 U. S. 672, 1 Sup. Ct. 544, 27 L. Ed. 271. We are not unaware that, where a part only of a chose in action has been assigned, the assignee has been allowed to sue in equity, upon the theory that courts of law would not recognize the right to split up a single cause of action into many

actions without the assent of his debtor, since it might subject him to many embarrassments not contemplated in the original contract. Mandeville v. Welch, 5 Wheat. 277, 5 L. Ed. 87. But even in case of partial assignments it is not necessary to sue in equity if the debtor consents to the assignment. 5 C. J. 1000. In this case the whole interest was assigned by the same instrument to two assignees, although in unequal shares, and these two assignees are the complainants, and the whole chose, and not a part of it, is the subject-matter involved. If there are equitable grounds why the assignees should not have proceeded at law, they do not suggest themselves. The defense has not interposed objections, and none were made by the District Judge, and under the circumstances we are not now inclined to dispose of the case otherwise than upon the merits.

[1] We start with the proposition that there is conceded to be $1,500,000 in the possession of the defendant which it is not entitled to withhold, provided the Russian government has through its proper officials effectively transferred and assigned all the right, title, and interest it may at any time have had therein to the plaintiffs in this suit, so that upon payment being made to the plaintiffs in the proportions to which they may be respectively entitled the defendant can be compelled to pay twice, because some Russian government at some time in the future may repudiate the action taken by those who signed the agreement of December 18, 1917, and deny their authority to act as the official representatives of Russia. We also find that this fund belongs to the complainants in the following proportions: $713,176.07 to the Agency Company; $786,823.93 to the Recording Company. What interest, if any, on these respective sums the complainants may be entitled to will be considered in a subsequent part of the opinion.

We come, then, to consider first whether the Russian government has surrendered effectively any interest it may have had in the $1,500,-000 owing by the defendant; and it is to be observed in respect to this phase of the case that the agreement of December 18, 1917, by which the Russian government is said to have transferred to complainants all its interest in the fund was by Khrabroff as president of the Russian Supply Committee in America, "acting for and on behalf of the Russian government," which reads as follows:

"Whereas, by agreement dated the 8th day of March, 1916, made between the parties hereto and * * * as voting trustees, two hundred (200) shares of the capital stock of * * * the Agency Company, were assigned and pledged to the said voting trustees as security for the performance by the Agency Company of the two contracts mentioned in said agreement; and

"Whereas, all matters and questions arising out of or in connection with the performance of said contracts have now been adjusted and settled and it is desired to dissolve the voting trust created by said agreement and to reassign said shares:

"Now, therefore, this indenture witnesseth: The parties hereto hereby consent and agree to the cancellation of the said hereinabove recited agreement, dated the 8th day of March, 1916, and to the dissolution of the voting trust thereby created and the reassignment of the shares of the capital stock of the Agency Company mentioned in said agreement and the delivery of the certificates of said shares to the holders of the voting trust certificates issued under the provisions of said agreement."

Whatever rights the Russian government may at any time have had in the fund of $1,500,000, they came to an end with the execution of the above document, provided General Khrabroff had authority to act on behalf of the Russian government. The claim that he had no authority to act for the government of Russia is not taken seriously by us. His authority is conclusively shown. General Khrabroff was president of the Russian Supply Committee. That committee as previously said was created in October, 1915. Associated with General Khrabroff on the committee were the commercial attaché, the naval attaché and the financial attaché to the Russian embassy at Washington, the official character of all of whom had been duly recognized by the government of the United States, as appears from a diplomatic list issued by the Department of State and also from the certificate of the Russian ambassador to the United States, Boris Bakhmetieff, all of which are in the record.

On July 5, 1917, the United States government recognized Boris Bakhmetieff as the Russian ambassador. The record contains a certificate, signed and sealed on May 8, 1918, by Robert Lansing, Secretary of State of the United States of America, stating that Boris Bakhmetieff presented his letter of credence to the President and was officially received by the President as ambassador extraordinary and plenipotentiary of Russia on July 5, 1917, and that he has since that date been recognized by the Department of State as the ambassador of Russia. The certificate of the ambassador declared the official character of the Russian Supply Commission, and that it was organized to purchase supplies in the United States for Russia, and to accept supplies purchased or manufactured in the United States for Russia, and that it had power to settle all matters relating to contracts for supplies so purchased or manufactured during the time herein involved.

[2] Who is the sovereign de jure or de facto of a country is a question for the political departments of the government. It is not a judicial question. The decision of the matter by the political departments is in this country conclusive upon the judges. Jones v. United States, 137 U. S. 202, 212, 11 Sup. Ct. 80, 34 L. Ed. 691.

The same principle is the established law of England. Republic of Peru v. Dreyfus, 38 Ch. Div. 348, 356, 359. In the same way the question who represents and acts for a foreign sovereign or nation in its relations with the United States is determined, not by the judicial department, but exclusively by the political branch of the government. In re Baiz, 135 U. S. 403, 10 Sup. Ct. 854, 34 L. Ed. 222. So that the certificate of the Secretary of State, above referred to, certifying to the official character of Boris Bakhmetieff as the Russian ambassador to the United States is not only evidence, but it is the best evidence, of Mr. Bakhmetieff's diplomatic character, and is to be regarded by the courts as conclusive of the question, and the court could not proceed upon argumentative and collateral proof. And the certificate of Mr. Bakhmetieff, given under his hand and seal as Russian ambassador, concerning the membership and powers of the Russian Supply Committee, must be regarded in like manner as an

authoritative representation by the Russian government on that subject, and as such binding and conclusive in the courts of the United States against that government on the matters to which it relates.

In the Goods of Anne Dormoy, 3 Hagg. Ecc. 767 (1832), the court held that the certificate of the French consul general was sufficient proof of the law of France, the doubt being whether the French ambassador himself should not have certified, instead of the consul general. In the Goods of Klingman, 3 Swabey & Tristram, 18 (1862), the ambassador to Great Britain of the King of Hanover gave a certificate under the seal of the legation that a will executed in accordance with law of England was a valid will under the law of Hanover, and the court held that such a certificate was sufficient evidence of the foreign law. In the Goods of Prince Oldenburg L. R. 9 Prob. Div. 234 (1884), the question was as to the law of Russia concerning the validity of a will of a deceased member of the royal family. The court received in evidence a certificate under the hand and seal of the Russian ambassador in England to the effect that by the law of Russia no testamentary dispositions of any member of the royal family could have any effect unless approved by the Emperor. The certificate was accepted as sufficient proof of the law of Russia.

[3] The court has no doubt as to the validity of the settlement made in December, 1917. The principle of law is well established that the rights and liabilities of a state are not affected by a change in the form or the personnel of a government, no matter how that change may be effected. The obligations of a state, the debts due to and from it, are not affected by any transformation in the internal organization of its government. In Taylor's International Public Law, § 161, he says:

"As the people as a whole were bound at their creation by the acts of organized agents, each new government succeeds not only to the fiscal rights but to the fiscal obligations of its predecessor."

And in section 160 he says:

"It is the privilege of every state to adopt any form of government it deems best suited to its internal wants and conditions, and its identity is never lost so long as its corporate existence survives. While that is preserved neither internal revolutions, nor alienations of parts of its territory can diminish any of its rights or discharge it from any of its obligations."

The question at issue being, on this phase of the case, whether the Russian government has effectually divested itself of all interest in the moneys now in the hands of the defendant, this court holds that the certificate of the personal representative of that government, duly accredited to and recognized by the government of the United States, certifying that the official who assumed to assign and release any such interest as his government might have was authorized to act in behalf of his government in making such assignment and release, is competent and conclusive evidence, which the court below properly held to be decisive.

[4] This brings us to the question as to the rate of interest which the defendant should be required to pay to the complainants. In the agreement of September 14, 1917, the defendant agreed that, in the

event of any portion of the $1,500,000 fund becoming payable to the Recording Company from the defendant, the latter—

"will allow a charge by you [the Recording Company] for interest at the rate of 2 per cent. per annum, or such other rate as the Can Company [defendant] may actually receive from its banking house on the deposit of the aforesaid sum upon such sum as may be paid to you from the aforesaid sum; said interest to be figured from November 1, 1917, to the date of payment of the amount. It is furthermore understood that no charge for interest prior to November 1, 1917, shall be allowed."

At the time that agreement was made there were, as we have seen, disputes pending between the Recording Company, the Agency Company, and the Russian government, and also between those parties and the defendant. As this fund was withheld pending the settlement of the disputes, it was agreed that interest was "to be figured from November 1, 1917, to the date of payment of the amount," and it was also expressly agreed, as above appears, that "no charge for interest prior to November 1, 1917, shall be allowed." The District Judge accordingly has held, rightfully, that the Recording Company was entitled to interest only from November 1, 1917.

Then the agreement was that interest was to be allowed at the rate of 2 per cent. per annum, or such other rate as the defendant received from its banking house on the deposit of the $1,500,000 fund; and the testimony in the record shows that defendant has not received from any banking house interest on any deposit at a higher rate than 2 per cent. per annum since November 1, 1917. The District Judge accordingly has held that the Recording Company is entitled to interest at the rate of 2 per cent. per annum from November 1, 1917, to December 28, 1917, and that from December 28, 1917, it is entitled to interest at the rate of 6 per cent. per annum. His theory evidently was that the Recording Company on December 28, 1917, was entitled to receive the $786,823.93, a final settlement having been arrived at, but as the defendant declined to pay when the time for payment arrived on December 28, 1917, and stated that it would not pay except "pursuant to the judgment of a court," it was from that time on in default, and therefore bound to pay interest at the legal rate of 6 per cent. per annum. We have no doubt that the defendant would be rightfully chargeable with that rate from the time of the default if the parties had not expressly agreed that the rate of interest should be 2 per cent. per annum "to the date of payment of the amount." If those words mean to the date when the money should have been paid, the District Judge was right in charging the defendant with interest at the rate of 6 per cent. per annum from December 28th. If the words, however, mean to the date when payment is made, he committed an error. If the parties meant the words to have the former meaning, they certainly did not say so; and the court is not at liberty to say so for them. In Ex parte Fewings, 25 Chan. Div. 338, Fry, L. J., said, "'Paid' refers to an actual receipt of money." And we say that in the same way "to the date of payment of the amount" means to the date of the actual receipt of the money.

The question of interest was little discussed at the argument. We derived from it no assistance as to the rights of parties to interest who are situated as are the parties to this litigation. The court below cited no authorities upon the question of interest, and neither of the counsel for the complainants have cited any in their briefs. This court approached this subject of the right of interest in sympathy with the holding of the lower court, thinking, though perhaps without justification, that the conduct of the respondent in withholding payment was influenced by the low rate of interest upon which the parties had agreed. On this branch of the case the court entertained much the same feeling as that which Lord Chancellor Herschell expressed in London, C. & D. Ry. Co. v. Southeastern Ry. Co., [1893] App. Cas. 429, 437, when he said:

"I confess that I have considered this part of the case with every inclination to come to a conclusion in favor of the appellants * * * of giving them interest * * * for this reason: that I think that when money is owing from one party to another, and that other is driven to have recourse to legal proceedings in order to recover the amount due to him, the party who is wrongfully withholding the money from the other ought not in justice to benefit by having that money in his possession and enjoying the use of it, when the money ought to be in the possession of the other party, who is entitled to its use. Therefore, if I could see my way to do so, I should certainly be disposed to give the appellants, or anybody in a similar position, interest upon the amount withheld, from the time of action brought, at all events. But I have come to the conclusion, upon consideration of the authorities, agreeing with the court below, that it is not possible to do so, although, no doubt, in early times the view was expressed that interest might be given under such circumstances by way of damages."

The English and the American law on the subject of interest differ, or did differ, at the time Lord Herschell wrote. The courts of this country generally allow interest at the legal rate by way of damages from the time of the maturity of an obligation, where the parties have not made an express agreement for interest after maturity. We have not in this case that difficulty to encounter. The difficulty here is that we do not see our way to sustaining the decree of the District Judge in allowing interest at the rate of 6 per cent. from December 28, 1917, on the sum due the Recording Company. That interest we might have allowed, were it not for the express agreement of the parties that the fund should bear interest at the rate of 2 per cent. until payment.

Prior to St. 37 Hen. VIII, c. 9, the taking of interest for the use of money was unlawful in England. That statute authorized the taking of interest, and fixed the lawful rate at 10 per cent. per annum, and punished any one who received more with forfeiture and imprisonment. The history of the right to interest in England is a matter of curious interest until 1854, when St. 17 & 18 Vict. c. 90, abolished all usury laws and established "free trade in money," largely through the influence of Jeremy Bentham. In this country the courts from the beginning viewed the allowance of interest with greater favor than the courts of England. There was never any doubt with our courts about the right to interest when expressly contracted for, or where an undertaking to pay it might be implied from the usages of trade;

and from a very early date the American courts recognized the fact that the English common law was not suited to the conditions existing in this country and they declined to follow it. In Selleck v. French, 1 Conn. 32, 6 Am. Dec. 185, Chief Judge Swift, speaking for the Connecticut Supreme Court of Errors, specified nine classes of cases in which interest was allowed in that state, and concluded by saying: "Such are the principles which have been long established in this state." And the fifth of the propositions it is interesting to note was the following:

"5. Where one has received money for the use of another, and it was his duty to pay it over, interest is recoverable for the time of the delay; but if the holder of money for another is guilty of no neglect or delay, he will not be chargeable with interest."

The principle that one who has not agreed to pay interest is nevertheless chargeable with it from the time of his default in making payment is undoubtedly the law in this country. In Chicago v. Tebbetts, 104 U. S. 120, 125, 26 L. Ed. 655, the principle was recognized and applied that a party guilty of unreasonable and vexatious delay in making payment is chargeable with interest from the time the debt became due, and is not relieved by offering to pay interest from the time when the delay began to be unreasonable and vexatious. In that case the delay was accompanied by litigation; as the court put it, the city had litigated and contested the demand year after year and in court after court.

In 22 Cyc. 1498, it is said to be the rule that interest is allowed as damages where there has been unreasonable and vexatious delay in making payment.

We do not, however, have to consider what limitations, if any, attach to the doctrine above announced in so far as the Recording Company's claim to interest is concerned; for we are dealing with an express agreement which the parties made as to the payment of interest. In 16 Am. & Eng. Encyc. of Law, p. 1053, it is laid down that—

"As a matter of course, where the interest of the parties as to the rate after maturity is expressed in the contract, such rate, if not illegal, will in general control."

This is the law of New York; the courts holding that, when a contract provides that interest shall be paid at a specified rate until the principal is paid, the contract rate governs until the payment of the principal, or until the contract is merged in a judgment. Taylor v. Wing, 84 N. Y. 471; O'Brien v. Young, 95 N. Y. 428, 47 Am. Rep. 64.

In Holden v. Trust Co., 100 U. S. 72, 25 L. Ed. 567, the maker of a note agreed to pay it, with 10 per cent. interest. The court held that interest should be computed at that rate up to the maturity of the note, and thereafter at 6 per cent. After calling attention to the fact that the agreement of the parties extended no further than to the time fixed for the payment of the principal and was silent as to everything beyond that, the court said:

"If payment be not made when the money becomes due, there is a breach of the contract, and the creditor is entitled to damages. Where none has

been agreed upon, the law fixes the amount according to the standard applied in all such cases. It is the legal rate of interest where the parties have agreed upon none. If the parties meant that the contract rate should continue, it would have been easy to say so. In the absence of a stipulation, such an intendment cannot be inferred."

And see Brewster v. Wakefield, 22 How. 118, 16 L. Ed. 301; Bernhisel v. Firman, 22 Wall. 170, 22 L. Ed. 766. If the local law is different, the federal courts will follow it. Cromwell v. County of Sac, 96 U. S. 51, 61, 24 L. Ed. 681; Ohio v. Frank, 103 U. S. 697, 26 L. Ed. 631. In New Orleans v. Warner, 175 U. S. 120, 147, 20 Sup. Ct. 44, 44 L. Ed. 96, the agreement was that if the warrants were not paid upon the date fixed for presentation they should bear interest at the rate of 8 per cent. until paid. The court, after referring to Holden v. Trust Co., supra, and the other cases cited, said:

"These very cases, however, recognize the principle that, if the parties themselves have fixed a rate to be paid up to the time of payment, that rate will be respected. In this case both the statute and the warrants provided that such warrants shall bear interest at the rate of 8 per cent. 'until paid,' and we are therefore of opinion that complainant is entitled to that rate from November 26, 1894, the date of filing the bill and issuing the subpœna."

The commencement of the suit was a sufficient demand to charge the defendant with interest from that day.

When the agreement is for the payment of interest at a certain rate until the note is paid the parties have agreed upon the amount of the damages to be paid because of the nonpayment of the principal at maturity. Reeves v. Stipp, 91 Ill. 609. In Browne v. Steck, 2 Colo. 70, the note sued on provided for interest at the rate of 10 per cent. per month from maturity until paid. The court regarded the rate specified as prima facie sufficient to establish the measure of damages for the breach of the contract. This was followed in Buckingham v. Orr, 6 Colo. 587, 591, 592. In Daniel on Negotiable Instruments (6th Ed.) vol. 2, § 1458, that authority says:

"And if the note runs with a certain rate of interest until paid that rate, if legal, runs after maturity as before."

And see Augusta National Bank v. Hewins, 90 Me. 255, 38 Atl. 156; Jennings v. Moore, 189 Mass. 197, 75 N. E. 214; Seymour v. Continental Life Ins. Co., 44 Conn. 300, 26 Am. Rep. 469. We conclude therefore that in an action at law if the parties agree upon the rate of interest until the money is paid, or until date of payment, that agreement is controlling and fixes the measure of damages upon default.

But this is not an action at law. It is a suit in equity, and the question arises whether the same rule is to be applied that would be applicable if the action had been at law. The courts of equity have long had certain rules which they applied to certain classes of cases. If a trustee was guilty of unreasonable delay in investing the trust fund or in transferring it to those destined to receive it he was compelled to pay interest to the cestui que trustent even where it was not prayed by the bill. An executor or administrator whose duty it was to pay the testator's obligations as soon as he had assets collected which were

sufficient for the purpose was himself charged with interest at the same rate the obligations bore. And if he failed to account promptly to the residuary legatee for the surplus of the estate he himself had to pay interest for the balance improperly retained. So if a trustee of a bankrupt's estate neglected to pay a dividend to the creditors, equity required him to pay interest from the time when the breach of duty commenced. A trustee could not make a profit out of his trust, and if in breach of his duty he used the trust fund in trade, the cestui had the option of taking either interest or the actual profits which might have been realized. Sometimes he was charged in England with 4 per cent. and sometimes with 5 per cent. interest, and sometimes with compound interest, according to the circumstances of the case. In this country the trustee who has been guilty of misconduct has been usually charged the legal rate of interest. But the class of cases to which reference has been made have been cases where interest has not been derived from any contract or agreement or statute, but in accordance with the well-established principles of equity jurisdiction. And we are dealing here with an actual agreement fixing the rate of interest to be paid from a specified date "to the date of payment."

We are not aware that equity will construe such an agreement differently from the construction placed upon it at law. The construction to be placed on the language of contracts is the same both at law and in equity. Jersey City v. Flynn, 74 N. J. Eq. 104, 70 Atl. 497; 13 C. J. 521. And contracts for interest are governed by the same rules of construction and interpretation as are other contracts. 16 Am. & Encyc. of Law, p. 1001. In 22 Cyc. 1475, it is said:

"The courts of equity, in decreeing or refusing interest, generally follow the law; but interest is sometimes allowed by courts of equity, in the exercise of a sound discretion, when it would not be recoverable at law."

We find no reason and no authority for saying that equity will not follow the law in giving effect to the agreement of the parties as to the rate of interest with which the defendant was to be charged "to date of payment." In Ex parte Fewings, supra, the agreement was to pay at the rate of 5 per cent. per annum so long as the principal or any part thereof remained unpaid. The claim was reduced to judgment, and in England judgments carry interest at the rate of 4 per cent. The Chief Judge in Bankruptcy held that, where the parties had expressly agreed that the rate should be 5 per cent. until paid, the creditor would be entitled to that rate after judgment and until paid. The Lords Justices of the Court of Appeal reversed the holding, and held that the true construction was that interest at the rate of 5 per cent. should be paid so long as any part of the principal remained due under the contract, so long as the contract for payment remained in force, but that the contract came to an end when judgment was entered and the liability under it was gone, being merged in the judgment, so that it could not therefore be said that there was an agreement to pay 5 per cent. So in the case now under discussion the rate of 2 per cent. continues until the decree is entered.

We must conclude from what has been said that the decree was

erroneous in so far as it awarded to the Recording Company interest at the rate of 6 per cent. per annum on the sum of $786,823.93 from December 28, 1917, to the entry of the decree. The Recording Company would have been entitled under the agreement of September 14, 1917, to interest at the rate of 2 per cent. per annum from November 1, 1917, to the entry of the decree, if it had not been for the agreement of December 22, 1917. By that agreement the Recording Company assigned to the Agency Company one-half of the interest it should receive upon the moneys withheld by the defendant. The decree should have provided for the payment to the Recording Company of one-half the interest on the sum of $786,823.93 at the rate of 2 per cent. per annum from November 1, 1917, to the entry of the decree.

[5] We now come to the interest the Agency Company was entitled to receive. Upon the trial the Agency Company urged (1) that it was entitled to interest on the entire $1,500,000 from the time the several installments thereof fell due to December 22, 1917, and thereafter on $713,176.07 to the date of decree, at the rate of 6 per cent. per annum, and also one-half of any and all interest which the Recording Company might be entitled to receive from the defendant; or (2) if that be denied, that defendant be required to account to the Agency Company for the profits realized by the defendant from the use of the funds in its business and that the plaintiff should also receive one-half of any and all interest which the Recording Company might be entitled to receive from the defendant; or (3) if neither of these contentions should be upheld, that it was entitled to interest at the rate of 6 per cent. per annum on $713,176.07 from December 28, 1917, to the date of the decree, and, further, one-half of any and all interest which the Recording Company might be entitled to receive from the defendant.

The District Judge held that the Agency Company was not entitled to interest on its $713,176.07 until after the December settlement and the Agency Company's demand on December 28, 1917. From that date he held the Agency Company entitled to interest from the defendant on its $713,176.07 at the rate of 6 per cent. per annum. He also held that it was entitled, in pursuance of the terms of the agreement of December 22, 1917, between the Agency Company and the Recording Company to one-half of the interest on the Recording Company's $786,823.93 from November 1, 1917, to December 28, 1917, which defendant was under obligation to pay to the Recording Company at the rate of 2 per cent. per annum, and the decree so provided. Neither of the plaintiffs have appealed, but the defendant in its appeal disputes the allowance of interest.

From what has been said it appears that the Agency Company was entitled to one-half of the interest which the Recording Company is to receive on $786,823.93 from November 1, 1917, to the entry of the decree, instead of to December 28, 1917, as the lower court directed. But with that question determined there remains to be settled the question concerning the interest on $713,176.07, which we have seen is due to the Agency Company out of the $1,500,000 retained by the

defendant. While the defendant agreed to pay interest at the rate of 2 per cent. per annum on the sum of $786,823.93 due to the Recording Company, it never expressly agreed to pay any interest on the $713,-176.07 due to the Agency Company; and in the agreement of December 22, 1917, wherein the Agency Company and the Recording Company adjusted matters as between themselves, it was stated that there was due to the Agency Company "a balance of $713,176.07 and one-half of any and all interest which the Recording Company may receive upon the moneys withheld by the American Can Company" the defendant herein. It is evident for reasons we are not concerned with that it was not contemplated that interest should be paid by the defendant to the Agency Company on the balance of $713,176.07. Under these circumstances the defendant was not chargeable with interest until it placed itself in default, but from that time it was chargeable with interest at the legal rate.

We have pointed out in an earlier part of this opinion that the High Court of Chancery from early days compelled trustees to pay interest when they withheld the trust fund. That practice our equity courts followed. In Gray v. Thompson, 1 Johns. Ch. 82, Chancellor Kent charged a trustee with interest on a trust fund which he had failed to distribute, because he rendered no sufficient excuse for not distributing it as it was his duty to have done. Other cases in equity might readily be cited. And in this country our courts have applied the principle in actions at law. The general rule is stated in 22 Cyc. 1505, where the authorities are collected. It is there said:

"Where money belonging to another is not paid over to the person entitled to receive it at the time it should be paid over, interest is generally allowed as damages for such wrongful withholding thereof."

And in 22 Cyc. 1514, it is also said, citing the authorities, that:

"Where the amount of the demand is sufficiently certain to justify the allowance of interest thereon the existence of a set-off or counterclaim which is itself unliquidated will not prevent the recovery of interest on the balance of the demand found due from the time it became due."

And where the amount of a demand is definitely agreed upon by the parties, interest will be allowed from the date of such liquidation. Thomas v. Wells, 140 Mass. 517, 5 N. E. 485; Clark v. Dutton, 69 Ill. 521; Hoagland v. Segur, 38 N. J. Law, 230.

We do not overlook the fact that, where the amount demanded is disputed on reasonable grounds and in good faith, interest will not be allowed on the demand until the right thereto is authoritatively determined. We think, however, that it was the duty of the defendant to pay when it was properly informed that the parties "had arrived at a final settlement" and demand of payment was made on December 28, 1917. The defendant's refusal to pay without a lawsuit is not to be excused by any of the circumstances of the case. We therefore agree with the court below that the Agency Company is also entitled to interest on its $713,176.07 at the rate of 6 per cent. per annum from December 28, 1917.

In what has been said concerning interest we have pointed out the principles which should have been applied to the case by the District Judge at the time the decree was entered. The situation is not now what it was at that time, because of the failure of either of the complainants to appeal from the decree. The result is that neither of the complainants is entitled to ask the court to increase the amount of interest which it is entitled to receive from the defendant up to the entry of the decree. This court has made no calculation for the purpose of determining the exact amount of interest the complainants would have received under the decree as entered and under the decree as it should have been entered if the correct principle had been applied. We have indicated in what the error consisted; and if it appears that the rectification of the error will reduce the amount of interest due from the defendant the decree must be modified accordingly.

As the Agency Company did not appeal, it is strictly entitled to claim only one-half of the 2 per cent. interest which the Recording Company will receive from the defendant on $786,823.93 from November 1, 1917, to December 28, 1917; that being the amount awarded to it under the decree below. But the counsel of each complainant has asked the court to settle the question of interest as between the two complainants as though each had appealed. In compliance with that suggestion the Recording Company must be directed to pay over to the Agency Company one-half of the 2 per cent. interest to be received from defendant on $786,823.93 from November 1, 1917, to the entry of the decree.

The case is remanded to the District Court, which is directed to proceed in accordance with this opinion.