**SECURITIES AND EXCHANGE COMMISSION v. ASSOCIATED GAS & ELECTRIC CO. et al.***

District Court, S. D. New York.
Aug. 29, 1938.

*Order affirmed 99 F.2d 795.

900

Chester T. Lane, of Washington, D. C. (Chester T. Lane, of Washington, D. C., Lewis M. Dabney, Jr., of Dallas, Tex., and Milton V. Freeman and David Ginsburg,

both of Washington, D. C., of counsel), for Securities and Exchange Commission.

Travis, Brownback & Paxson, of New York City (Charles M. Travis, Garrett A. Brownback, and Jesse J. Holland, all of New York City, of counsel), for defendants.

CLANCY, District Judge.

The defendant Associated Gas and Electric Company (hereinafter referred to as "the Company") is a public utility holding company organized in New York. In November, 1928, the Company began to issue certain obligations denominated 5½% Convertible Investment Certificates (hereinafter referred to as "investment certificates") due November 15, 1938, and during 1928 and 1929 succeeded in disposing of approximately $31,000,000 of these investment certificates which were obligations created by resolution of the Company's board of directors and are unsecured. In May, 1933, the Company adopted and proceeded to enact a "rearrangement of debt capitalization" known as the "recap plan", which included the investment certificates in its operation. The prosecution of this plan succeeded in procuring a substantial decrease in the outstanding amount of investment certificates. The approaching maturity, however, induced the Company to extend, in May, 1937, to those who still held the investment certificates, special plans looking to the disposition of that issue. The Company, at that time, mailed to the remaining holders of investment certificates, a letter repeating the proposal which had been advanced by an offer made on November 18, 1936, to exchange for the investment certificates an equal principal amount of 5½%— 6½% Sinking Fund Income Debentures due 1986, and further offering either to accept exchange of their certificates for an equal amount of five-year 6% investment certificates due November 1943 or to exchange their certificates for 10% in cash and 90% of principal amount in 5½% investment certificates due November 15, 1939, both of the proposed exchange obligations being in all respects identical with the outstanding investment certificates except for the later maturity date. On July 2, 1937, the Company sent another letter to the then remaining holders of the investment certificates advising them that the exchange would be accomplished not by the issuance of a new certificate but by stamping the

outstanding investment certificates with a statement incorporating the particular modification accepted by the holder. When the outstanding investment certificate bore coupons, new coupons would be attached to cover the interest payments during the additional period fixed by the holder's choice in accordance with the conditions of his choice.

On January 26, 1938, when about $3,-250,000 of investment certificates had been neither exchanged nor extended, the Company sent to the remaining holders of investment certificates a letter proposing to modify the offers contained in its letters of May 10 and July 2, 1937. This again provided the holder with a choice of two alternatives, one of which offered him an immediate cash payment of 20% of the face amount of his certificate upon his acceptance of an extension of the maturity of the remainder to November 15, 1939 at the same 5½% per annum interest and the other of which provided for an additional 2% cash payment upon his agreeing to an extension of the balance to November 15, 1943. The choice of either alternative was to be effected by stamping on the certificate a legend incorporating the holder's choice and not by the issuance of a new certificate. The form of the legend was as follows:

"Twenty per cent (20%) of the principal amount of this Certificate. has heretofore been paid. The holder of this Certificate, for value received, has agreed to the extension of the maturity of the unpaid portion of the principal hereof to November 15, 1939, to which each successive holder thereof is bound by the acceptance hereof. This Certificate shall continue to bear interest, payable quarterly, upon the unpaid portion of the principal hereof, at the rate of five and one-half per cent (5½%) per annum."

After the stamping, the defendant Transfer and Paying Agency returned by registered mail the stamped certificates and the checks for 20% of the principal amount and the additional 2% if the holder chose 1943 as the due date.

Plaintiff moves for a temporary injunction against the defendants' using any instruments of interstate commerce and the mails in connection with the effecting of these transactions with the holders of the investment certificates as a violation of § 5(a) of the Securities Act of 1933, 15 U.S.C.A. § 77e(a), and § 6(a) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79f(a), inasmuch as no registration statement under the Securities Act nor declaration and permission under the Public Utility Holding Company Act has been filed or obtained as required by those statutes.

The decision of this motion, therefore, involves a determination of two questions: First, Is the stamped Certificate sent out by the Company a security? and, second, Is it sold under the provisions of § 5(a) of the Securities Act and § 6(a) of the Public Utility Holding Company Act?

A statute should be so construed as to effectuate its evident purpose. Royal Indemnity Co. v. American Bond & Mortgage Co., 289 U.S. 165, 53 S.Ct. 551, 77 L.Ed. 1100; St. Louis & O'Fallon Ry. Co. v. U. S., 279 U.S. 461, 49 S.Ct. 384, 73 L. Ed. 798. The purpose of the Public Utility Holding Company Act, § 1(c), 15 U.S.C.A. § 79a(c), is to effect regulation of companies described therein, of which the defendant Company is admittedly one, to prevent the abuses recited in § 1(b), 15 U.S.C. A. § 79a(b). The very first abuse stated is the inability of investors to obtain information necessary to appraise the financial position or earning power of the issuers of securities. § 1(c) states that it is the policy of the statute to meet the problems and eliminate the evils recited and requires its interpretation in accordance with that policy. The Securities Act of 1933, 15 U.S.C.A. § 77a et seq., does not state its policy, but a study of the whole statute demonstrates that it is intended to procure for the investor information prepared in accounting form prescribed by the Commission (paragraphs (25) and (26) of Schedule A, 15 U.S.C.A. § 77aa, pars. (25, 26) and calculated to advise him about his bargain. Both statutes serve other purposes, those others served by the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq., being more important even than the fortune of the investor, one being to insure their ability to perform the duty of fair public service owed by the companies included. Because their search of financial aid and support from the public offers opportunities for fraud and may imperil the rendition on fair terms of the service on which the people depend, their financing by the public has been declared a matter of public interest explicitly by the Public Utility Holding Company Act. The Securities Act implies a public interest in

all companies seeking financial support from the public.

■ Consequently, the defendant's endeavor to limit the nature of the transaction between the holder of the investment certificate who was willing to extend the maturity and the Company is, wholly at variance with the spirit of both statutes and the purposes they were deliberately designed to effect. To constrict the decision of this motion to. a definition of the legal relationship between the extending certificate holder and the Company would, in the opinion of the Court, ignore and tend to defeat pro tanto the purposes of both enactments. The Securities Act and the Public Utility Holding Company Act are not intended to determine the liability at law of any company at the suit of a certificate holder. Securities Act, §§ 11, 12 and 16, 15 U.S.C.A. §§ 77k, 77l, 77p; Public Utility Holding Company Act, §§ 18, 27, 28 and 29, 15 U.S.C.A. §§ 79r, 79z—1 to 79z—3. The Securities Act deliberately excepts all single transactions involving the creation of single debts in current transactions. § 3(a) (3), 15 U.S.C.A. § 77c(a) (3). So does the Public Utility Holding Company Act. § 6(b), 15 U.S.C.A. § 79f(b). Both are intended to protect the general public from imposition at the time when the company's capital structure is to be affected and when the money of the public is sought for general purposes, not particular current transactions. They would apply even if none of the public's money is actually obtained or if no security were actually disposed of. Public Utility Holding Company Act, § 4(a) (3), 15 U.S.C.A. § 79d(a) (3); Securities Act, § 2(3) and (4), 15 U.S.C.A. § 77b(3, 4). Consequently, we take it that to determine whether or not the transactions come within the meaning of the laws it is necessary to look not at any individual certificate holder and what he does nor even at what the Company does with him. The proper way is to look at the Company and determine what is its purpose; what is it seeking to accomplish, and, by considering the transaction from this point of view, to determine the meaning and the importance of its deeds.

■ Assuming this attitude, the Court has no difficulty in determining that the stamped certificates mailed by the Company's agent, the defendant Transfer and Paying Agency, described as a Jersey business trust, constituted the sale of a security. The purpose and aim of the Company is to secure the retention and use of the certificate holders' money for a further period after the present due date, November 15, 1938. Whether on that day the holder takes $80 from his pocket and pays it over to the Company or whether he allows the Company to retain the $80 it has of his money cannot alter the case. In either case, the need of the filing of its statements required under both the Securities Act and the Public Utility Holding Company Act is apparently the same and exactly the same purpose is served by their filing, unless we must assume the continuance unchanged of the Company's financial condition while the certificates have been outstanding. This would be true of a secured obligation and is doubly true of an unsecured one.

The stamped certificate sent out by the Company's agent, whether it contained the old promise to pay, renewed, or the . old promise, modified by the extension of maturity, or a new promise, serves all the purposes of the old bond or debenture and is a security within the definitions of that word found in both statutes and within the purposes and aims of both. And, were we to assume a difference between a new certificate and the old certificate, stamped, we would we think attribute to the parties an understanding of the meaning of the latter that did not exist in the comprehension of the holder. More, we would render both statutes nugatory within the limits of the facts of this case in plain violation of the mandate given for its interpretation in the Public Utility Holding Company Act, § 1(c), 15 U.S.C.A. § 79a(c), which we have stated before.

■ If we view the case as the defendant asks from the legal relationship of the parties, the conclusion is not different. The defendant argues that the legend is merely a notice to subsequent holders and that the extension agreement consists of the Company's proposal of January 26, 1938 and the holder's acceptance in his letter of transmittal. Whether or not this be technically correct, we shall assume that it is, inasmuch as this is a motion for a preliminary injunction and we are confined to the facts presented in the papers. The defendant's position is that the consent of the holder to an extension of the maturity date is a wholly unilateral agreement made by the holder without any consideration from the debtor—valid under Personal Property Law, Consol.Laws, c. 41, § 33(2)—that nothing was given for the exchange in the

way of a new promise to pay and that neither the language of the letter of transmittal, which the Company says expresses the holder's acceptance of the Company's offer, nor the legend stamped on the certificate imposes any new obligation on the Company, and that, therefore, the stamped certificate cannot in any wise be called a security. However, the language of the letter of January 26, 1938, includes this sentence:

"It is planned, therefore, to divide the maturity into three parts, one part to be paid in advance of the original due date, one part to be met in 1939, and the balance of the issue to be retired in 1943 or earlier * * *."

We take it that the phrases "plan to meet a maturity in 1939" or "plan to retire the balance of the issue in 1943" are express proposals to take up a debt in either of the years named. Either phrase imports an agreement to pay in some fashion the outstanding debt in that year. If the Company insists they convey no new promise but refer only to an intention to meet a 1938 maturity at a later time, the answer is that they composed and prepared the letter and will not now be heard to dispute the apparent sense of their own words. If, therefore, the letter of January 26, 1938 is, as the defendant says, an offer, and the letter of transmittal which it itself prepared an acceptance thereof, then the holder of the certificate who sent the letter of transmittal expresses his acceptance thus:

"* * * requests: The payment of 20% of the face amount of such certificates in cash on account of the principal thereof, and the extension of the maturity of the balance of the principal to November 15, 1939."

"* * * pursuant to the terms and conditions of the offer of Associated Gas and Electric Company dated January 26, 1938 * * *."

He clearly accepted the offer of the payment of the balance stated in the Company's letter of January 26, 1938 as part of its bargain and when the Company stamped the certificate in accordance with the authority conveyed by the letter of transmittal with a legend stating the new date of maturity of the balance, it was expressing in the form chosen and formulated by itself the agreement reached by the Company and the holder. Consequently, the fixing of the stamp on the certificate and certainly the sending of the stamped certificate was in every sense the issuance of a new promise to pay.

We need perform no tour de force to find a new relationship between the parties established by stamping the certificate. We cannot ignore that the Company itself chose to affix the legend phrased in its own words on the old certificate. By its own act it united certificate and legend, thereby incorporating them one with the other. The legend derives its sense from the certificate to which it is affixed. The reduction payment went out with the letter though the legend refers to it as "heretofore" paid. The entire transaction was a unit. So that at the least, the stamping of the certificate was no less than a reaffirmation of the old promise to pay—a remaking or renewal of it. We note the last sentence of the legend providing for a continuation of interest. The Company says this cannot even be urged as evidence of any new obligation to pay interest because the certificates provided therefor until payment. This provision in the certificates gave nothing to the holder after November, 1938. Interest would run anyway, as a matter of law, Civil Practice Act N. Y. § 480; Prager v. New Jersey Fidelity & Plate Glass Ins. Co., 245 N.Y. 1, 156 N.E. 76, 52 A.L.R. 193. The certificate merely established a standard for computation of damages (Agency of Canadian Car & F. Co. v. American Can Co., 2 Cir., 258 F. 363, 6 A.L.R. 1182) so that the last sentence of the stamped legend is a new promise to pay what is really and essentially interest. Since interest supposes principal, the Company's affixing the legend to the certificate is a reacknowledgment of the debt and a new expression of liability therefor. Nothing less would warrant a promise to pay interest.

To defeat the Statute of Limitations, the stamped certificate, acknowledging as it does a reduction of principal by part payment, will be a reacknowledgment of the liability for the whole debt and imply a new promise of the obligor to pay the residue. Harper v. Fairley, 53 N.Y. 442. This introduces not so much a new right as the preservation of the remedy, but it demonstrates the possibility that sometime the courts may have to regard the stamped certificates as new promises. When the Company stamped the certificate, something new was created. In the hands of a holder in due course after No-

vember, 1938, the instrument, if a coupon certificate, was free of all defenses or defects in title (Negotiable Instruments Law, Consol.Laws, c. 38, § 96) which afflicted his transferror—a character it did not have before the stamping. Such a holder would have it before maturity for the extension is not of the time within which he may exert his right to sue but of the time when his right to collect or have his money shall arrive. This new character may be said to derive from the holder's extension of the maturity but it attaches to the Company's obligation and when the Company sent it out it put the certificate in circulation fully aware of its new character.

[12] We think the stamped certificates are sold within the meaning of the statutes. Indeed, we believe this follows from our conclusion that the stamped certificate is a security. It was disposed of when it was stamped or certainly when it was mailed to the holder by the defendant Transfer and Paying Agency for the use of the certificate holders' money for the period of the extension. When the original certificate was delivered to the subscriber in exchange for his cash, there certainly was a sale. Here a new promise to pay a different amount, at another date, is delivered for the cash that belongs to the holder and which he substantially redelivers or, if the defendant prefers, for the holder's waiver of immediate payment. Title to that obligation passes when the Company gives it in exchange for the holder's expression of willingness to permit further use of his money.

The Court finds comfort in reaching this decision in the decisions of the Interstate Commerce Commission which has interpreted the extension of an outstanding obligation as the issuance of a security subject to its approval under § 20a of the Interstate Commerce Act, 49 U.S.C.A. § 20a which makes it "unlawful for any carrier to issue any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier (hereinafter in this section collectively termed 'securities') * * * unless and until, and then only to the extent that, upon application by the carrier, and after investigation by the commission * * * the commission by order authorizes such issue or assumption." Minneapolis & St. Louis R. Bonds, 124 I.C.C. 562; Erie Railroad Co. Extension Contracts, 65 I.C.C. 131; Bath & Hammondsport R. Bonds, 79 I.C.C. 267; San Luis Central Railroad Bonds, 79 I.C.C. 737. While these are not cogent authorities, they gain weight in view of the Securities Act's exception, § 3(a) (6), 15 U.S.C.A. § 77c(a) (6), of securities subject to the provisions of § 20a of the Interstate Commerce Act, 49 U.S.C.A. § 20a. The assumption is not far fetched that the Interstate Commerce Act, in the opinion of Congress, attained in the field of railroad securities the purposes of the Securities Act in others and of the Public Utility Holding Company Act in its special field and that its administration covered in the railroad securities field all the operations of the latter acts.

Since, if the stamped certificate was a security sold within the meaning of the Public Utility Holding Company Act, the declaration required by that act and the order permitting it to become effective are required to make legal the operations of the Company which we have discussed and since such declaration has not been filed, it becomes unnecessary to decide the numerous other questions raised by the motion.

Motion for preliminary injunction granted.