Robert ABRAHAMSON and Marjorie
Abrahamson, Plaintiffs-Appellants,

v.

Malcolm K. FLESCHNER et al.,
Defendants-Appellees.

No. 212, Docket 75–7203.

United States Court of Appeals,
Second Circuit.

Submitted Feb. 28, 1976 *.

Decided Feb. 25, 1977.

Rehearing En Banc Unanimously
Denied Jan. 6, 1978.

Certiorari Denied May 16, 1978.

* See our interim opinion in this case. *Abrahamson v. Fleschner,* 537 F.2d 27 (2 Cir. 1975).

Ronald H. Alenstein, New York City (Kenneth A. Barry, and Shea, Gould, Climenko, Kramer & Casey, New York City, on the brief), for plaintiffs-appellants Robert Abrahamson and Marjorie Abrahamson.

Richard E. Carlton, New York City (Robert D. Owen, James E. Tyrrell, and Sullivan & Cromwell, New York City, on the brief), for defendants-appellees Malcolm K. Fleschner, William J. Becker and Fleschner Becker Associates.

Richard G. McGahren, New York City (Kenneth A. Sagat, and D'Amato, Costello & Shea, New York City, on the brief), for defendant-appellee Harry Goodkin & Co.

Mark M. Jaffe, New York City (Allan J. Berdon, Joseph F. Aman, and Hill, Betts & Nash, New York City, on the brief), for defendant-appellee Harold B. Ehrlich.

Harvey L. Pitt, Gen. Counsel, Paul Gonson, Associate Gen. Counsel, David J. Romanski, Asst. Gen. Counsel, James H. Schropp, Atty., SEC, Washington, D. C., for Securities and Exchange Commission, amicus curiae.

Before MANSFIELD, TIMBERS and GURFEIN, Circuit Judges.

TIMBERS, Circuit Judge:

Of the several questions presented under the antifraud provisions of the federal securities laws, those under the Investment Advisers Act of 1940 appear to be of first impression at the appellate level.*

· The appeal is from a judgment entered in the Southern District of New York, Robert L. Carter, *District Judge*, 392 F.Supp. 740, dismissing the complaint, on cross-motions for summary judgment, in an action to recover damages for alleged violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970), and of Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5 (1976); and alleged violations of Section 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–6 (1970), and of Rule 206(4)–1 thereunder, 17 C.F.R. § 275.206(4) (1976).

The essential questions presented and our rulings thereon are as follows:

(1) Whether the complaint states a claim upon which relief can be granted under Section 10(b) of the 1934 Act and Rule 10b–5.

We hold it does not.

(2) Whether defendants who are general partners of the investment partnership are investment advisers within the meaning of Section 202(a)(11) of the Advisers Act.

We hold they are.

(3) Whether there is an implied private right of action for damages under the Advisers Act.

We hold there is.

(4) Whether the complaint alleges compensable damages under the Advisers Act.

We hold it does.

(5) Whether the complaint states a claim upon which relief can be granted under Section 206 of the Advisers Act and Rule 206(4)–1.

We hold it does.

We affirm the dismissal of the Exchange Act claim; but as to the dismissal of the Advisers Act claim, we reverse and remand for trial.

## I. FACTS

The following summary of the essential facts is believed necessary to an understanding of our rulings on the questions presented.[1] The facts are not in dispute.

Plaintiffs Robert Abrahamson and Marjorie Abrahamson, husband and wife, were limited partners of defendant Fleschner Becker Associates (FBA), an investment partnership, from its inception on July 1, 1965 until they withdrew on September 30, 1970.

Defendants Malcolm K. Fleschner (Fleschner) and William J. Becker (Becker) are

---

* We note that about the time our Court unanimously denied rehearing en banc in the instant case the Fifth Circuit held that there is an implied right of action for damages under § 206 of the Advisers Act. *Wilson v. First Houston Investment Corp.*, 566 F.2d 1235 (5 Cir. 1978).

1. We assume familiarity with our prior opinion in this case, 537 F.2d 27, and that of the district court, 392 F.Supp. 740.

general partners of FBA. Fleschner was its founder and has been a general partner since its inception. Becker became a general partner on April 1, 1966. Defendant Harold B. Ehrlich (Ehrlich) was a general partner from October 1, 1968 through September 30, 1969. Defendant Harry Goodkin & Company (Goodkin) is a firm of certified public accountants which audited FBA's books and certified FBA's financial reports for the fiscal years 1966, 1967 and 1968.

In late 1964 and in 1965 plaintiffs had several conversations with Fleschner who expressed his intention of forming an investment partnership. He told plaintiffs that the partnership would have a conservative investment policy. Plaintiffs expressed their concern for financial security and conservatism in their investments.

By a partnership agreement dated July 1, 1965, FBA began as a small partnership. The original partners consisted of one general partner (Fleschner) and eight limited partners (plaintiffs, four members of Fleschner's family and two others). Plaintiffs' initial contribution was $150,000.

FBA grew rapidly. By April 1, 1966 it had two general partners and thirty-five limited partners; and by October 1, 1968 it had three general partners and sixty-six limited partners. Each partner had an account which represented the appreciated value of his contributions to the pooled funds, less withdrawals and certain fees. By October 1, 1968 FBA's assets were approximately $60 million.

For managing the partnership investments, the general partners received substantial fees. They were paid 20% of FBA's net profits and net capital gains for each fiscal year. In addition, the partnership agreement of October 1, 1968 provided for an annual salary of $25,000 for each general partner who managed the partnership's investments.

The limited partners did not participate in managing the partnership's investments. A limited partner could withdraw all or part of the balance in his capital account at the end of any fiscal year (September 30), provided that he gave the required advance notice. Prior to October 1, 1968, 30 days notice was required; thereafter, 60 days notice was required. There were similar notice requirements for withdrawal from membership in the partnership.

With the increase in the number of limited partners and the concomitant increase in the size of the firm's assets, certain changes were made in the structure of the partnership. The original July 1, 1965 partnership agreement was superseded by a new agreement dated April 1, 1966 which in turn was superseded by the October 1, 1968 agreement. The principal change effected by the 1966 agreement was the addition of Becker as a general and managing partner and the inclusion of additional limited partners. The 1968 agreement, in addition to authorizing salaries of $25,000 per year for those general partners who managed the partnership's investments, included Ehrlich as a general partner; added a large number of limited partners; expanded and detailed the stated purposes of the partnership; and made a number of other changes referred to below.

During the period plaintiffs were limited partners of FBA the general partners mailed monthly reports to all of the firm's limited partners. These reports were concise, two paragraph statements which set forth the percentage increase or decrease in the value of the firm's investments for the year to date and compared this performance with Standard & Poors 500 Stock Average.

The reports also included statements of the firm's investment policy. Between November 1967 and April 1968 the reports repeatedly represented that FBA was maintaining a "low risk stance" and ."a most conservative posture." [2]

In addition to the monthly reports, during 1967 and 1968 Goodkin mailed to the

2. For examples of these representations in the monthly reports, see the district court opinion, 392 F.Supp. at 742 n. 2.

limited partners certified year end financial reports. These financial reports included balance sheets which showed the total of FBA's investments in securities. The balance sheets of September 30, 1967 and September 30, 1968 did not disclose that the firm was investing in unregistered securities.[3] Investments in such securities were included in the aggregate of all portfolio investments. The value of FBA's total investments in securities was denominated as the "market value" of the securities.

Despite the representations in the monthly reports that FBA's investments were most conservative and of low risk, between September 1967 and September 1968 the firm increased its investments in unregistered securities from approximately 15% to approximately 72% of its portfolio. Between September 1968 and September 1969 the firm's investments in unregistered securities fluctuated from about 72% to 88% of its portfolio.[4] During this latter period the monthly reports continued not to disclose the firm's sizable investments in unregistered securities.

In either December 1969 or January 1970 plaintiffs received the financial report for the fiscal year ending September 30, 1969. This report was not prepared by Goodkin, but by another accounting firm. A footnote to this report disclosed that approximately 77% ($30,411,868) of FBA's total investments in securities ($39,355,310) consisted of unregistered securities. The firm's total assets as of September 30, 1969 were $51,747,995.

Plaintiffs first learned of FBA's substantial investments in unregistered securities from the September 30, 1969 report. Having received this report in December 1969 or January 1970, it was too late for them to withdraw from the firm, in accordance with the partnership agreement, at the end of the fiscal year which ended September 30, 1969. Plaintiffs did withdraw at the end of the following fiscal year, on September 30, 1970. This was the earliest they could withdraw their investments or as partners under the terms of the partnership agreement.

During the five year period they were limited partners, both plaintiffs received substantial net profits.[5] Robert Abrahamson realized a net profit of $156,097; Marjorie Abrahamson a net profit of $133,081.35.

Both plaintiffs claim that as of late 1968 their investments were worth considerably more than indicated by the firm's financial reports, and that the firm incurred substantial losses on its investments in unregistered securities. Without apportioning between losses sustained from investments in unregistered securities and other losses,[6] Robert Abrahamson claims that between September 30, 1968 and the date of his withdrawal his capital account sustained losses totalling $454,979. Marjorie Abrahamson claims total losses of $799,821 during this period.

Plaintiffs commenced the instant action in the Southern District of New York on January 25, 1971. Jurisdiction was invoked under Section 27 of the Exchange Act, 15 U.S.C. § 78aa (1970), and Section 214 of the Advisers Act, 15 U.S.C. § 80b–14 (1970). The complaint embodies the claims stated above and summarized in our prior opinion. 537 F.2d 27.

---

**3.** Unregistered securities are securities which are not registered with the Securities and Exchange Commission. They have only a limited market and are subject to restrictions as to further sale.

**4.** In their complaint in the instant action, plaintiffs alleged that during the period they were limited partners the firm made between 40 and 80 separate purchases of unregistered securities, including the securities of more than 40 different issuers. They alleged that most of these purchases took place after 1967.

**5.** See the schedule set forth in the district court opinion, 392 F.Supp. at 743, showing plaintiffs' capital contributions, interim withdrawals, final distributive shares and net profits.

**6.** Plaintiffs claim that they are entitled to recover the difference between what they received when they withdrew from the partnership in 1970 and what they would have received had they withdrawn as of September 30, 1968. Accordingly they did not attempt an apportionment between losses attributable to excessive investments in unregistered securities and losses from unchallenged investments.

Both sides having moved for summary judgment, Judge Carter on March 4, 1975 filed an opinion, 392 F.Supp. 740, granting defendants' motions and denying plaintiffs' motion. Without reaching the merits of plaintiffs' claims under either the Exchange Act or the Advisers Act, the judge held that, since plaintiffs had realized a net profit on their overall five-year investments in FBA, they had failed to prove damages compensable under the federal securities laws. From the judgment entered March 27, 1975 dismissing the complaint, the instant appeal has been taken.

## II. EXCHANGE ACT CLAIM

We need not tarry with plaintiffs' claim under Section 10(b) of the 1934 Act and Rule 10b–5 for we find that each of the arguments urged by plaintiffs in support of that claim is without merit.

■ First, in an effort to meet the requirement of Section 10(b) and Rule 10b–5 that they must allege a fraud "in connection with the purchase or sale of any security," [7] plaintiffs argue that their interest in FBA was a "security" and that the modifications of the partnership agreement in 1968 constituted an exchange of one security for another.[8] In support of this theory, plaintiffs rely on cases which have held that significant modifications in the rights of security holders may constitute a "sale" of one security and "purchase" of another under Section 10(b) and Rule 10b–5, *Ingenito v. Bermec Corp.*, 376 F.Supp. 1154, 1179–82 (S.D.N.Y.1974); or a "sale" or "issue" of a security under the Public Utility Holding Company Act of 1935, *SEC v. Associated Gas & Elec. Co.*, 24 F.Supp. 899 (S.D.N.Y.), *aff'd*, 99 F.2d 795 (2 Cir. 1938); or an "issue" of stock under the Interstate Commerce Act, *United States v. New York, New Haven & Hartford R. Co.*, 276 F.2d 525 (2 Cir. 1959), *cert. denied*, 362 U.S. 961 (1960). We do not believe that this line of cases supports plaintiffs' claim in the instant case. Before changes in the rights of a security holder can qualify as the "purchase" of a new security under Section 10(b) and Rule 10b–5, there must be such significant change in the nature of the investment or in the investment risks as to amount to a new investment. We hold that the modifications effected by the adoption of a new partnership agreement on September 30, 1968 did not constitute the "purchase" and "sale" of new securities.

■ Second, plaintiffs argue that they are entitled to recover under Section 10(b) and Rule 10b–5 because they were fraudulently induced not to sell their partnership interests. They say that they would have withdrawn from the firm in 1968 if defendants had not misrepresented the true nature of the firm's investments at that time. The short answer to this branch of plaintiffs' argument is that the requirement of fraud in connection with the purchase or sale of a security is not satisfied by an allegation that plaintiffs were induced fraudulently *not* to sell their securities. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737–38 (1975).

We affirm the dismissal of plaintiffs' Exchange Act claim.[9]

7. This is the familiar provision of both Section 10(b) and Rule 10b–5. Obviously, the fraud alleged by plaintiffs was not "in connection with" either their initial investment in the partnership on July 1, 1965 or their withdrawal from the firm on September 30, 1970.

8. The principal modifications relied on by plaintiffs in their effort to show that the September 30, 1968 partnership agreement fundamentally changed the nature of their investment were: expansion of the general partners' authority to invest in other businesses and to make loans; authorization of $25,000 per year salaries for managing partners; shortening of the notice requirement for year end withdraw-

als of capital; provision for automatic termination of the partnership after ten years; and authorization for amendment of the partnership agreement by a vote of one-half of the limited partnership interests and two-thirds of the general partnership interests, rather than by the Executive Committee of the general partners as before.

9. Our affirmance of the dismissal of the Exchange Act claim is on the ground that the complaint fails to state a claim upon which relief can be granted—not on the ground relied upon by the district court for dismissal, namely, that, since plaintiffs had realized a net profit on their overall limited partnership investment,

## III. ADVISERS ACT CLAIM

We come next to what we consider to be the chief question presented on this appeal—whether the complaint states a claim upon which relief can be granted under Section 206 of the Investment Advisers Act of 1940 (the Act) [10] and Rule 206(4)–1 thereunder.[11]

The subordinate questions which we must consider in connection with this claim are (1) whether any of the defendant general partners are "investment advisers" within the meaning of Section 202(a)(11) of the Act,[12] (2) whether there is an implied private right of action for damages under the Act; and (3) whether plaintiffs have alleged compensable damages under the Act.

For the reasons below, we answer each of these questions in the affirmative. Accordingly, we reverse the dismissal of the Advisers Act claim and remand the case for trial on that claim.[13]

### (1) "Investment Advisers" Under Section 202(a)(11)

■ Turning first to the threshold question whether any of the general partner defendants are "investment advisers" with-

---

they had failed to prove damages compensable under the federal securities laws. We shall discuss this ground of the district court decision under the Advisers Act claim, Section III, infra.

10. Section 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–6 (1970), in relevant part provides:

> "It shall be unlawful for any investment adviser by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
> (1) to employ any device, scheme, or artifice to defraud any client or prospective client;
> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;
> * * *
> (4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4), by rules and regulations, define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative."

11. Rule 206(4)–1, 17 C.F.R. § 275.206(4)–1 (1976), in relevant part provides:

> "(a) It shall constitute a fraudulent, deceptive, or manipulative act, practice or course of business within the meaning of section 206(4) of the Act, for any investment adviser, directly or indirectly, to publish, circulate or distribute any advertisement:
> * * *
> (5) Which contains any untrue statement of a material fact, or which is otherwise false or misleading.
> (b) For the purposes of this section the term 'advertisement' shall include any notice, circular, letter or other written communication addressed to more than one person, or

any notice or other announcement in any publication or by radio or television, which offers (1) any analysis, report, or publication concerning securities, or which is to be used in making any determination as to when to buy or sell any security, or which security to buy or sell, or (2) any graph, chart, formula, or other device to be used in making any determination as to when to buy or sell any security, or which security to buy or sell, or (3) any other investment advisory service with regard to securities."

12. Section 202(a)(11) of the Investment Advisers Act, 15 U.S.C. § 80b–2(a)(11) (1970), in relevant part provides:

> "'Investment adviser' means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities . . . ."

13. It was the Advisers Act claim to which we invited the parties and the SEC as amicus curiae to address their supplemental briefs when we filed our interim opinion following oral argument of this appeal. 537 F.2d at 28. We express our appreciation for the helpful briefs from counsel for all parties and the SEC in response to our invitation.

Likewise we invited the parties and the SEC as amicus curiae, in connection with appellees' petitions for rehearing, to file further supplemental briefs on the issue of whether the general partners of defendant Fleschner Becker Associates were investment advisers within the meaning of the Advisers Act (the issue dealt with below in section III(1) of this opinion). Such further supplemental briefs were filed and considered by us. The petitions for rehearing were denied and the panel opinions were adhered to.

in the meaning of Section 202(a)(11), we hold that they are.

It is clear from the record that the general partners received substantial compensation for managing the limited partners' investments. Each of the three partnership agreements in effect between 1965 and 1970 provided that the general partners would be paid for their services 20% of the firm's net profits and net capital gains for each fiscal year. In addition, the partnership agreement of October 1, 1968 authorized an annual salary of $25,000 for each general partner who managed investments.

Since the general partners received compensation for their investment services, the only remaining inquiry under the statute is whether they were "engage[d] in the business of advising others" with respect to investments. On two independent grounds, we believe they were.

First, the monthly reports which contained the alleged fraudulent representations were reports which provided investment advice to the limited partners. The general partners' compensation depended in part upon the firm's net profits and capital gains. These in turn were affected by the size of the total funds under their control. The monthly reports were an integral part of the general partners' business of managing the limited partners' funds. In deciding whether or not to withdraw their funds from the pool, the limited partners necessarily relied heavily on the reports they received from the general partners.

Second, wholly aside from the monthly reports, we believe that the general partners as persons who managed the funds of others for compensation are "investment advisers" within the meaning of the statute. This is borne out by the plain language of Section 202(a)(11) and its related provisions, by evidence of legislative intent and by the broad remedial purposes of the Act.

■ The Investment Companies Act of 1940 and the companion Investment Advisers Act (Title II of the same enactment) were among statutes designed to eliminate certain abuses in the securities industry which were found to have contributed to the stock market crash of 1929 and the depression of the 1930s. *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186 (1963). The 1940 legislation was based upon exhaustive studies by the SEC which culminated in a number of extensive reports on investment trusts, investment companies and investment advisers. The Investment Companies Act and the Advisers Act were intended to cover important areas of the securities industry which had not been covered by the earlier statutes. The Investment Companies Act is concerned with investment companies and other persons, including certain investment advisers, who deal with investment companies. The Advisers Act covers *all* investment advisers.

As stated in Section 201 of the Advisers Act, 15 U.S.C. § 80b–1 (1970), that Act was based upon the findings and recommendations set forth in an SEC Report on investment counsel and advisory services. Securities and Exchange Commission, Investment Counsel, Investment Management, Investment Supervisory and Investment Advisory Services, H.R.Doc. No. 477, 76th Cong., 2d Sess., 1 (1939) (hereinafter "SEC Report"). The SEC Report referred to two types of investment advisers: (1) those with management powers over their clients' funds and the power to make purchases and sales for their clients ("discretionary"), and (2) those who merely made recommendations to their clients ("advisory"). SEC Report at 13. It noted the conspicuous need for regulation of individuals "who may solicit the funds of the public to be *controlled, managed,* and supervised . . . ." (emphasis added) SEC Report at 28. The report made it clear that its findings and recommendations were intended to cover persons who made purchases and sales of securities with their clients' funds.

The House and Senate Committee reports also make clear the intent of Congress. The Report of the Senate Committee on Banking and Currency which accompanied the bill to the Senate floor stated:

"The report of the Commission to the Congress and the record before the committee is clear that the solution of the problems and abuses of investment advisory services—*individuals and companies which either handle pools of liquid funds of the public or give advice with respect to security transactions*—cannot be effected without Federal legislation.

\* \* \*

Virtually no limitations or restrictions exist with respect to the honesty and integrity of persons who may solicit funds to be *controlled, managed,* and supervised." (emphasis added) S.Rep. No. 1775, 76th Cong., 3d Sess., 21 (1940).[14] Similarly, the House Committee on Interstate and Foreign Commerce noted in its report the need to regulate firms which "managed, supervised, and gave investment advice" with respect to clients' funds. H.R. Rep. No. 2639, 76th Cong., 3d Sess., 27 (1940).[15]

■ In short, as for legislative intent, we believe that the SEC Report, together with the House and Senate Reports, make it clear that Congress intended to reach persons who receive compensation for investing funds of their clients.

■ Moreover the plain language of Section 202(a)(11) and related provisions of the Act bear out this legislative intent. Section 202(a)(11) includes any person who "advises" others with respect to investments. Section 203(c)(1)(D), 15 U.S.C. § 80b–3(c)(1)(D) (1970), requires the investment adviser to disclose the nature and scope of his "authority . . . with respect to clients' funds and accounts" in his registration statement. And Section 205, 15 U.S.C. § 80b–5 (1970), establishes certain standards for investment advisers with respect to "investment advisory contracts" which include contracts "to act as an investment adviser or to manage any investment or trading account . . . ." These provisions reflect the fact that many investment advisers "advise" their customers by exercising control over what purchases and sales are made with their clients' funds.

We hold that the defendant general partners of FBA are investment advisers within the meaning of Section 202(a)(11) of the Act.[16]

---

**14.** In its general statement on the background to the Advisers Act, the Senate Report stated:

"Similarly, it is difficult definitely to estimate the amount of funds under the influence *or control* of investment advisers. However, some idea of the size of the funds administered by investment advisers may be deduced from the fact that 51 firms for which information was obtainable by the Commission *managed, supervised* and gave investment advice with respect to funds aggregating approximately $4,000,000,000." (emphasis added) S.Rep., *supra* at 21.

**15.** In 1960 and again in 1970, Congress considerably broadened the coverage of the Advisers Act. The Senate Report accompanying the bill which contained the 1960 amendments to the Act stated, with particular application here:

"There are at present over 12½ million individuals in the United States who own corporate securities, nearly double those in 1952. It has been noted that this new group offers strong temptation to confidence men and swindlers who may give them biased advice *or misuse their funds or securities.*" (emphasis added) S.Rep. No. 1760, 86th Cong., 2d Sess. 4 (1960), *reprinted in* [1960] U.S. Code Cong. & Admin.News, at 3502.

**16.** Defendant Harry Goodkin & Company argues that, since it was not an "investment adviser" it cannot be held liable for aiding and abetting a fraud committed by those who were investment advisers. Goodkin points out that Section 206 applies only to an investment adviser and that Section 202(a)(11)(B) excludes from the definition of an investment adviser an accountant acting in the practice of his profession. We agree that the exemption excludes an accountant's usual activities from the scope of the Act and excludes the accountant from coverage under the registration provisions and many of the other regulatory provisions of the Act even if the accountant is employed by an investment adviser. But the exemption does not shield the accountant from liability under the antifraud provisions of the Act if the accountant aids and abets an investment adviser with *knowledge* that his conduct is assisting an investment adviser in defrauding a client. Cf. Section 209(e) of the Act, 15 U.S.C. § 80b–9(e) (1970), which authorizes the SEC to seek injunctive relief and, if necessary, to recommend criminal proceedings against those who "aid, abet [or] counsel" violations of the Act. In view of the limitation of Section 206 to investment advisers, however, we believe that before Goodkin can be held liable as an aider and

(2) *Private Right of Action Under Section 206*

■ As with other provisions of the federal securities laws under which the courts have found implied private rights of action, Section 206 of the Advisers Act does not expressly authorize private actions. We therefore must decide whether a private right of action is to be implied under that section. For the reasons below, we hold that it is.[17]

■ The Supreme Court has recognized in a variety of contexts that private rights of action may be implied in favor of the intended beneficiaries of a statute where necessary to implement the statute's underlying purposes. *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 13 n.9 (1971); *J. I. Case Co. v. Borak,* 377 U.S. 426 (1964); *Tunstall v. Brotherhood of Locomotive Firemen and Enginemen,* 323 U.S. 210 (1944); *Texas & Pacific R.R. v. Rigsby,* 241 U.S. 33 (1916). Cf. *Bivens v. Six Unknown Named Agents,* 403 U.S. 388 (1971); *Bell v. Hood,* 327 U.S. 678 (1946).

There are compelling reasons why the courts have been particularly willing to recognize private rights of action under the antifraud provisions of the federal securities laws. Those provisions are designed to protect specific classes of injured parties. Moreover the SEC—the agency charged with administration and enforcement of the federal securities laws—does not have sufficient resources alone to enforce the many provisions of the statutes. Absent judicial recognition of private rights of action, the federal securities laws most assuredly would fail to provide the effective regulation over the securities industry which Congress intended. In finding an implied right of action under Section 14(a) of the 1934 Act, the Supreme Court held in *J. I. Case Co. v. Borak, supra,* 377 U.S. at 432, that "Private enforcement . . . provides a necessary supplement to Commission action", and went on to state:

"[I]t is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose." *Id.* at 433.

■ Applying these principles, the courts of appeals consistently have recognized an implied right of action under the Investment Companies Act—the companion

---

abetter, there must be a showing that Goodkin: (a) knew of the investment adviser-client relationship; (b) had knowledge of the fraud; and (c) acted in concert with the investment adviser. Cf. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185 (1976).

Whether Goodkin is liable for aiding and abetting the investment advisers is one of the issues to be determined at trial pursuant to our remand.

As to whether FBA itself is a proper defendant with respect to the Advisers Act claim, for aught that appears in the record before us, we have serious doubts. The general partners as individuals, not FBA as an entity, were the investment advisers. If upon remand, and after a hearing, the district court finds no more than the record now discloses with respect to the liability of FBA itself under the Advisers Act claim, it should dismiss as against the firm.

17. The SEC has submitted to Congress a number of proposed amendments to the Advisers Act. One would provide explicitly for private actions under the Advisers Act. See Investment Advisers Act Release No. 491, 8 SEC Docket 744 (December 15, 1975). In announcing its proposal, the SEC repeated its view that the existing language was sufficient to imply a private right of action. Its proposal was intended to put to rest those few decisions which had found no implied right of action.

In the two district court cases in this Circuit in which the issue has been considered, the court has held that an implied right of action exists under the Advisers Act. *Jones v. Equitable Life Assurance Society,* 409 F.Supp. 370 (S.D.N.Y.1975); *Bolger v. Laventhol, Krekstein, Horwath & Horwath,* 381 F.Supp. 260 (S.D.N.Y.1975). *Accord, Angelakis v. Churchill Management Corp.,* CCH Fed.Sec.L.Rep. ¶ 95,285 (N.D.Cal.1975). *Contra, Gammage v. Roberts, Scott & Co.,* CCH Fed.Sec.L.Rep. ¶ 94,761 (S.D.Cal.1974); *Greenspan v. Eugene Campos Del Toro,* 73–638–Civ. (S.D.Fla. May 17, 1974).

The commentators who have reviewed these decisions agree that a private right of action should be implied under the Advisers Act. Note, Private Causes of Action Under Section 206 of the Investment Advisers Act, 74 Mich.L. Rev. 308 (1975); Lybecker, *Advisers Act Developments,* 8 Review of Securities Regulations 927, 934 (April 23, 1975); Note, Bolger v. Laventhol, Krekstein, Horwath & Horwath: Private Rights of Action Under the Investment Advisers Act, 48 Temple L.Q. 433 (1975).

to the Advisers Act. *Moses v. Burgin,* 445 F.2d 369 (1 Cir.), *cert. denied,* 404 U.S. 994 (1971); *Herpich v. Wallace,* 430 F.2d 792, 815 (5 Cir. 1970); *Esplin v. Hirschi,* 402 F.2d 94, 103 (10 Cir. 1968), *cert. denied,* 394 U.S. 928 (1969); *Taussig v. Wellington Fund, Inc.,* 313 F.2d 472, 476 (3 Cir.), *cert. denied,* 374 U.S. 806 (1963); *Brown v. Bullock,* 194 F.Supp. 207 (S.D.N.Y.), *aff'd,* 294 F.2d 415, 420–21 (2 Cir. 1961) (en banc). It is well settled that implied rights of action exist under Section 10(b) of the 1934 Act and Rule 10b–5, which contain substantially the same language as Section 206 of the Advisers Act. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730 (1975); *Superintendent of Insurance v. Bankers Life & Casualty Co., supra,* 404 U.S. at 13 n.9; *Fischman v. Raytheon Mfg. Co.,* 188 F.2d 783, 787 (2 Cir. 1951); *Kardon v. National Gypsum Co.,* 69 F.Supp. 512 (E.D.Pa.1946). Judicially implied rights of action also have been found under Section 14(a) of the 1934 Act, *J. I. Case Co. v. Borak, supra,* and under the Public Utility Holding Company Act of 1935, *Goldstein v. Groesbeck,* 142 F.2d 422 (2 Cir.), *cert. denied,* 323 U.S. 737 (1944).

Against this background, we turn to the question whether a private right of action should be implied under Section 206 of the Advisers Act.

In *Cort v. Ash,* 422 U.S. 66, 78 (1975), the Supreme Court suggested that the following factors be considered in determining "whether a private remedy is implicit in a statute not expressly providing one":

"First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted' . . .—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? . . . And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" (emphasis in original)

We believe that each of these factors point unmistakably toward recognition of an implied right of action under Section 206 of the Advisers Act. See *Piper v. Chris Craft Industries, Inc.,* 430 U.S. 1, 37–45 (1977).

The purpose of the Advisers Act was "to protect the public and investors against malpractice by persons paid for advising others about securities." [18] The Act was designed for the "especial" benefit of persons relying upon their investment advisers for advice. *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186–91 (1963).

Congress enacted the Advisers Act, as it had earlier securities legislation, mindful of the need for *federal* regulation of the securities industry. As the Senate Committee Report emphasized:

"The nature of the functions of investment advisers, their increasing widespread activities, their potential influence on security markets and the dangerous potentialities of stock market tipsters imposing upon unsophisticated investors, convinces the committee that protection of investors requires the regulation of investment advisers on a national scale.

The report of the Commission to the Congress and the record before the committee is clear that *the solution of the problems and abuses of investment advisory services . . . cannot be effected without Federal legislation.*" (emphasis added) S.Rep. No. 1775, 76th Cong., 3d Sess. 21 (1940).

---

18. S.Rep. No. 1760, 86th Cong., 2d Sess., 1 (1960).

The House Committee Report which accompanied the 1940 bill stated:

"The essential purpose of title II of the bill is to protect the public from the frauds and misrepresentations of unscrupulous tipsters and touts and to safeguard the honest investment adviser against the stigma of the activities of these individuals by making fraudulent practices by investment advisers unlawful." H.R.Rep. No. 2639, 76th Cong., 3d Sess., at 28 (1940).

We are not aware of any statement indicating that Congress considered the problem of private actions under the Advisers Act at the time of its enactment. Nor is there any indication that the SEC considered this matter when it adopted Rule 206(4)–1. Absent specific statements of legislative intent, we must examine the legislative purposes underlying the Act.

As stated above, the courts consistently have recognized that the Commission's resources are inadequate to the task of policing alone the federal securities laws. In enacting the 1940 legislation, Congress intended to provide effective *federal* regulation of an important segment of the securities industry. Failure to recognize a private right of action under the Advisers Act would effectively frustrate that purpose. We hesitate to reach such a result absent clear evidence from the Act's legislative history that private actions were not intended.

Turning to related provisions of the Advisers Act, Section 215(b), 15 U.S.C. § 80b–15(b) (1970), provides that any contract in violation of the Act shall be void. As the courts have held in construing nearly identical provisions of the other securities acts, the language of Section 215(b) strongly suggests that a private remedy should be implied and that such a remedy would be consistent with the other provisions of the Act. *Fischman v. Raytheon Mfg. Co., supra,* 188 F.2d at 787 n.4; *Kardon v. National Gypsum, Co., supra,* 69 F.Supp. at 514; see *Slavin v. Germantown Fire Ins. Co.,* 174 F.2d 799, 815 (3 Cir. 1949).

In arguing that a private right of action should not be recognized under the Advisers Act, appellees point to the difference between the language found in the jurisdictional provision of the Advisers Act and similar provisions of other securities acts.[19] Section 214 of the Advisers Act, 15 U.S.C. § 80b–14 (1970) in relevant part provides:

"The district courts of the United States . . . shall have jurisdiction of violations of this subchapter or the rules, regulations, or orders thereunder, and, concurrently with State and Territorial courts, of all suits in equity to enjoin any violation of this subchapter or the rules, regulations or orders thereunder."

By contrast, Section 22 of the 1933 Act, 15 U.S.C. § 77v (1970), Section 27 of the 1934 Act, 15 U.S.C. § 78aa (1970), and Section 44 of the Investment Companies Act, 15 U.S.C. § 80–a–43 (1970), provide that the district courts shall have jurisdiction of "all suits in equity *and actions at law* brought to enforce any liability or duty created by" those Acts.

Appellees argue that the omission of any reference to "actions at law" in Section 214 manifests a legislative intent to preclude private rights of action under the Advisers Act. We disagree. In our view, the reason for this omission is that each of the other Acts whose jurisdictional provisions refer to "actions at law" contains one or more sections *expressly* granting injured parties a private right of action for damages.[20]

---

**19.** Appellees also argue that recognition of a private right of action would be inconsistent with Section 209(e) of the Act and other enforcement provisions which provide that the Commission "may in its discretion bring an action" for injunctive relief. We find no merit in this argument. *The enforcement powers given the Commission under the Advisers Act are virtually identical to those of the other securities acts under which we have recognized implied private rights of action.* Unlike the Securities Investor Protection Act, which was involved in *Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412 (1975), the Advisers Act in general, and the antifraud provisions in particular, do not manifest a specific legislative intent to restrict enforcement to the Commis-

sion. Here, private suits would be consistent with Commission action. The provision allowing the Commission the usual discretion to sue simply makes it clear that the SEC is not *compelled* to sue in *every* case. Indeed it would be extraordinary for Congress to require an agency to bring enforcement proceedings in every instance. The Court in *Barbour* distinguished *J. I. Case Co. v. Borak,* where the Court had found private suits a necessary supplement for—rather than a hindrance to—Commission action. 421 U.S. at 423.

**20.** See Sections 11 and 12 of the 1933 Act, 15 U.S.C. §§ 77k and 77*l* (1970); Sections 9(e), 16(b) and 18 of the 1934 Act, 15 U.S.C. §§ 78i(e), 78p(b) and 78r (1970); Sections 16(a)

There is no provision in the Advisers Act which *expressly* provides for private actions; since it is a less complex statute, containing no express grants of right of action to private parties, a reference to "actions at law" would be superfluous.

There is not a shred of evidence in the legislative history of the Advisers Act to support the assertion that Congress intentionally omitted the reference to "actions at law" in order to preclude private actions by investors. Section 214, like the jurisdictional provisions of the other securities acts, was drawn to provide jurisdiction over actions expressly authorized by the statute. Far from indicating that Congress ever considered the matter of private actions in drafting Section 214, the only legislative history indicates that Congress attached no great importance to its omission. In their only references to Section 214, both the Senate and House Reports stated that the enforcement provisions of the Advisers Act were "generally comparable" to those of the Investment Companies Act, whose jurisdictional provision contains the "actions at law" language. S.Rep. No. 1775, 76th Cong., 3d Sess., at 23 (1940); H.R.Rep. No. 2639, 76th Cong., 3d Sess., at 30 (1940).[21]

In dealing with private rights of action under other securities acts, courts have referred to the "actions at law" language under the jurisdictional provisions to indicate the overall structure of those acts. But the "actions at law" language has never been relied upon as evidence that Congress *explicitly* considered the matter of private damage actions under the particular substantive provision in question. Had Congress provided explicitly for private damage actions it would be unnecessary to consider whether the remedy should be judicially implied. Indeed, under the antifraud provisions of other securities acts courts have recognized the *absence* of any legislative intent either to create or to deny private rights of action for damages. Here, as under the other statutes, it is clear that Congress simply did not consider the matter.[22]

The Supreme Court, in considering a different issue under the Advisers Act in *SEC v. Capital Gains Research Bureau, Inc.*, supra, 375 U.S. at 195, emphasized that the Act should "be construed like other securities legislation 'enacted for the purpose of avoiding frauds,' not technically and restrictively, but flexibly to effectuate its remedial purposes." (footnote omitted). We find that particularly cogent here where we are asked to determine whether there should be a private right of action to recover damages for what may be clear violations of the Act. Moreover, mindful of the Supreme Court's admonition in *J. I. Case Co. v. Borak, supra,*

and 17(b) of the Public Utility Holding Company Act of 1935, 15 U.S.C. §§ 79p(a) and 79q(b) (1970); Section 323(a) of the Trust Indenture Act of 1939, 15 U.S.C. § 77www(a) (1970); and Section 30(f) of the Investment Companies Act of 1940, 15 U.S.C. § 80a–29(f) (1970).

21. As originally introduced in the House and Senate, the proposed Advisers Act merely incorporated the jurisdictional provision of the Investment Companies Act. Section 203 of S. 3580 and H.R. 8935. The Investment Companies Act, in turn, had adopted the same language as found in Section 25 of the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79y. Section 40(a)(1) of S. 3580 and H.R. 8935. As reported out of the committees, the bills omitted all references to other statutes; and the Advisers Act was given its own jurisdictional provision which did not contain any reference to "actions at law brought to enforce any liability . . . ."

22. We need not decide whether the language of Section 214 which grants to the district courts jurisdiction over "violations of this subchapter or the rules, regulations, or orders thereunder" might cover private damage actions. See *Bolger v. Laventhol, Krekstein, Horwath & Horwath, supra,* 381 F.Supp. at 264. Courts have implied private rights of action under statutes which have no separate jurisdictional provision for civil damage suits. *Texas & Pacific R.R. Co. v. Rigsby, supra,* 214 U.S. at 39; *Odell v. Humble Oil & Refining Co.,* 201 F.2d 123, 126 (10 Cir. 1953); *Narramore v. Cleveland, C.C. & St.L. Ry. Co.,* 96 F. 298, 300 (6 Cir. 1899). Moreover, the general federal question jurisdictional provision, 28 U.S.C. § 1331 (1970), would apply here. See *Brown v. Bullock, supra,* 294 F.2d at 418.

377 U.S. at 433, we believe that we should provide "such remedies as are necessary to make effective the congressional purpose", rather than adopt a construction that would effectively defeat the purpose of providing federal regulation over an important segment of the securities industry.

We hold that there is an implied private right of action under Section 206 of the Advisers Act.[23]

**23.** Our concurring-dissenting colleague, in a characteristically thoughtful and innovative opinion, urges that a private right of action for damages should not be implied under the Advisers Act. We suggest that Judge Gurfein's opinion be read in the light of the following observations.

First, the basic premise of the dissent is the assumption that the Advisers Act was intended to provide "a *compulsory census* of investment advisers, and not . . . a pervasive regulatory scheme." (emphasis added) Post, 879, 883. A careful reading of the Advisers Act shows that, as enacted, it requires far more than a census. As the last of the series of federal securities laws enacted between 1933 and 1940, it is an integral part of a comprehensive regulatory scheme intended by Congress to eliminate certain abuses in the securities industry. The Supreme Court in *SEC v. Capital Gains Research Bureau, Inc., supra,* in referring to a fundamental purpose of the Advisers Act and its relationship to the other federal securities regulatory acts, stated:

"The Investment Advisers Act of 1940 was the last in a series of Acts designed to eliminate certain abuses in the securities industry, abuses which were found to have contributed to the stock market crash of 1929 and the depression of the 1930's. It was preceded by the Securities Act of 1933, the Securities Exchange Act of 1934, the Public Utility Holding Company Act of 1935, the Trust Indenture Act of 1939, and the Investment Company Act of 1940. A fundamental purpose, common to these statutes, was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry. As we recently said in a related context, 'It requires but little appreciation . . . of what happened in this country during the 1920's and 1930's to realize how essential it is that the highest ethical standards prevail' in every facet of the securities industry. *Silver v. New York Stock Exchange,* 373 U.S. 341, 366." (footnotes omitted) 375 U.S. at 186–87.

Second, while we do not claim the expertise of our dissenting colleague concerning hedge funds, post, 879, & n. 1, 884, we do suggest that much of the speculation of the dissent with respect to the investment policy of the general partners as managers of the fund (e. g. whether the partnership "was going to operate in the most speculative of investment activities", post, 884) and the intentions of plaintiffs in becoming limited partners, might better await the trial on the merits to which we have held plaintiffs are entitled. For after all, the posture of the case as it came to us from the district court was the dismissal of the complaint on the ground that plaintiffs realized a net profit on their overall limited partnership investments and therefore failed to prove damages compensable under the federal securities laws. 392 F.Supp. 740. While this holding of the district court is rejected, all we hold with respect to plaintiffs' Advisers Act claim is that they are entitled to their day in court and an opportunity to prove their claim. Post, 879. At that time, when the credibility of witnesses can properly be determined, many of the speculative factual issues suggested by the dissent appropriately can be resolved.

Finally, and perhaps of chief significance, the dissent does not dispute the eloquent absence of evidence that Congress ever considered allowing damages, as distinguished from injunctive relief, under the Advisers Act. The question of damages was not considered because the matter of a private right of action was not considered. The dissent's massive reliance upon the omission of the "actions at law" language in the Advisers Act and its inclusion in the jurisdictional provisions of other statutes, we think is misplaced. Judicially implied private rights of action have been recognized under various sections of the securities laws even though those sections, unlike other sections of the same statutes, contain no explicit provision for private actions. Here likewise there is no evidence that the omission was meant to exclude private actions. In this respect the present case is plainly different in a significant legal respect from *National R. R. Passenger Corp. v. National Ass'n of R. R. Passengers,* 414 U.S. 453 (1974), relied upon by the dissent, where "the legislative history of the Amtrack Act provide[d] a clear and convincing expression of Congress' intent to preclude anyone except the Attorney General and in certain situations an employee or his duly authorized representative from maintaining an action under the Act against petitioners" (414 U.S. at 465 (Justice Brennan concurring)), and transportation policies not pertinent here militated in favor of such a limitation. No such history or policies are to be found here.

**(3) *Compensable Damages Under the Advisers Act***

■ Appellees contend that plaintiffs have not alleged compensable damages under the Advisers Act. They argue that plaintiffs themselves were neither purchasers nor sellers of securities and that their claims are speculative because they are based upon the assertion that plaintiffs would have withdrawn from FBA earlier had they been told the truth about the partnership's investments. We disagree.

At the outset, we find no basis for appellees' assumption that plaintiffs' only alternative, had they learned the truth earlier about FBA's high percentage of investments in unregistered securities, was to withdraw their funds. Plaintiffs might have tried to persuade the general partners to conform the firm's investments to the conservative policy they had represented. Failing that, plaintiffs might have mobilized the other limited partners to exert pressure on the general partners.

We find appellees' reliance upon *Blue Chip Stamps v. Manor Drug Stores, supra,* on this aspect of the instant case to be misplaced.

■ The *Blue Chip* decision was based on the *express language* of Section 10(b) and Rule 10b–5 requiring a fraud "in connection with the purchase or sale of any security." [24] *Neither Section 206 of the Advisers Act nor Rule 206(4)–1 contains any such requirement.* While the Court stated in *Blue Chip* that the purchaser-seller limitation under Section 10(b) protected against vexatious and speculative claims, it did not

say or suggest that *any* claim would be too speculative for recovery under the other securities acts unless the plaintiff was a purchaser or seller. Indeed the Court acknowledged that provisions of the other securities acts afford rights of action to persons who are not purchasers or sellers. 421 U.S. at 733–34.

■ Acceptance of appellees' contention, moreover, would lead to a construction of the Advisers Act clearly inconsistent with the intent of Congress. As indicated above, Congress intended to protect investors against frauds committed by investment advisers who managed their clients' funds, as well as frauds committed by advisers who did not make purchases and sales for their clients. If the claims of a client whose adviser managed his funds were to be held to be too speculative simply because the client failed to allege that he would have taken some remedial action if he had known the truth, a large segment of those investors whom Congress meant to protect would be excluded from the Act's coverage. To accept appellees' contention would lead to the incongruous result that an investor's claims would be speculative even if the adviser had made fraudulent statements to conceal the fact that he was stealing his client's funds.

■ We believe that the differences in the language and purposes of Section 10(b) of the 1934 Act and Section 206 of the Advisers Act distinguish the instant case from *Blue Chip.* We also note that the policy considerations expressed in *Blue Chip* lend no support to appellees' arguments.[25]

---

**24.** The holding in *Blue Chip* was that persons who claimed that they had been fraudulently induced *not* to purchase securities were not within the class of persons protected by Section 10(b) of the 1934 Act and Rule 10b–5, under which recovery is limited to funds "in connection with the purchase or sale" of securities. In reaffirming the doctrine of *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2 Cir.), *cert. denied,* 343 U.S. 956 (1952), the Court also stated that "actual shareholders in the issuer who allege that they decided not to sell their shares because of an unduly rosy representation or a failure to disclose unfavorable material" might not be able to sue under Section

10(b) and Rule 10b–5. *Blue Chip Stamps v. Manor Drug Stores, supra,* 421 U.S. at 737–38.

**25.** In interpreting the express language of Section 10(b) and Rule 10b–5 in *Blue Chip,* the Court expressed concern about suits by persons who neither purchased nor sold securities but who claimed that they would have purchased or sold securities but for false representations made by someone whom they might not even have known. The Court noted that the "purchase or sale" requirement protected against vexatious suits by a potentially limitless class of plaintiffs and avoided the difficult questions of determining whether a plaintiff

Under Section 206, the plaintiff class is limited to the investment adviser's own clients. Since the investment adviser is compensated for his services, both client and adviser understand that the client will rely upon the adviser's judgment and advice. To characterize the client's reliance as speculative is to ignore the essence of the relationship. See *Galfand v. Chestnutt Corp.*, 545 F.2d 807 (2 Cir. 1976). Plaintiffs here allege fraudulent representations relating to specific purchases and sales of unregistered securities, thus providing a definable measure of damages. And a defrauded client may be deprived of *numerous* means of controlling his adviser's conduct and the management of his investments, only one of which is the remedy of withdrawing his funds altogether. We believe that the limited uncertainties involved in a case such as this are not sufficient to bar recovery on an otherwise valid claim; and they are adequately offset by requiring proof that the misrepresentations were material and proof of reliance.[26]

 We hold that plaintiffs have alleged damages compensable under Section 206 of the Advisers Act.[27]

## IV. MEASURE OF DAMAGES ON REMAND

In view of our remand for trial on the Advisers Act claim, we believe that the district court is entitled to some guidance on the proper measure of damages.

We do not agree with the district court's holding, 392 F.Supp. 740, that, since plaintiffs realized a net profit on their overall limited partnership investment, they failed to prove damages compensable under the federal securities laws.

 This is not to say, however, that a plaintiff may recover for losses, but ignore his profits, where both result from a *single* wrong. In determining on remand whether plaintiffs have sustained any damages from the alleged fraudulent investments, the district court should determine, first, at what point defendants' representations became fraudulent due to the increasing proportion of portfolio investments in unregistered securities. The court then should compute the total net losses on all holdings of unregistered securities due to changes in price *after* that date. Finally, the court should determine what proportion of FBA's holdings was inconsistent with representations

would or would not have purchased or sold securities but for the defendant's representations. *Id.* at 745–47.

Far from holding that claims of persons who were neither purchasers nor sellers would be too speculative under the other securities acts, the Court interpreted the express language of Section 10(b) and Rule 10b–5. And the Court expressly noted that many of the other securities acts have no "purchase or sale" requirement. 421 U.S. at 733–34.

26. Even the claims of a person who has purchased or sold securities are not free of uncertainties. A purchaser or seller necessarily alleges that he would *not* have made the purchase or sale had he known the true facts.

Although the claims of persons who neither purchased nor sold securities, in individual cases, may be *less* speculative than the claims of actual purchasers or sellers, *Blue Chip* weeds out suits by persons who may have had no interest in a security until discovering that someone has made a fraudulent statement which may give rise to a lawsuit. In view of the settlement value of a securities suit, this is an important consideration. Obviously an investor who has paid for the advice of his adviser is not the type of disinterested by-stander at

whom the *Blue Chip* decision was primarily aimed.

27. It is important to note that there is no issue in this case as to whether an investor may recover for negligent misrepresentations by his investment adviser. See *Ernst & Ernst v. Hochfelder, supra; Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1298–1301 (2 Cir. 1973) (distinguished in *Ernst & Ernst v. Hochfelder, supra,* 425 U.S. at 209 n. 28); *SEC v. Capital Gains Research Bureau, Inc., supra.* Plaintiffs here have alleged that defendants' misrepresentations were *intentional.* Whether defendants thought that the price of the unregistered securities would rise or not has no bearing on the issue of scienter. Although the general partners' own funds were part of FBA's pooled assets, they would be liable under Section 206 if they *intentionally* deceived the limited partners to prevent the limited partners from withdrawing their contributions *or for any other reason. Ernst & Ernst v. Hochfelder, supra.* Scienter does not require a showing of intent to cause a loss to a plaintiff. *SEC v. Capital Gains Research Bureau, Inc., supra,* 375 U.S. at 192 n. 39.

that the partnership was in a "most conservative posture" and the other representations made to the limited partners. The proper measure of damages then would be that part of net losses incurred on unregistered securities after the point when the defendants' representations became fraudulent which stems from the portion of those investments inconsistent with defendants' representations.[28]

We of course do not intimate any views as to whether plaintiffs in fact have sustained *any* damage and, if so, *how much*. All we hold is that they are entitled to their day in court and an opportunity to prove, if they can, their claim under the Advisers Act.

Affirmed as to the dismissal of the Securities Exchange Act claim; as to the dismissal of the Investment Advisers Act claim, reversed and remanded for trial.

GURFEIN, Circuit Judge, concurring and dissenting:

I concur in the affirmance of the dismissal of the § 10(b) claim.

With great respect for my brother Timbers as a master of securities law, I must respectfully dissent from the holding that, under this complaint, we should imply a private right of action at law for damages for alleged violation of § 206 of the Investment Advisers Act, 15 U.S.C. § 80b–6 ("Advisers Act") by these limited partners of a speculative hedge fund.[1]

According to the majority, the issue in this case is whether to imply a *private* right of action. It therefore draws an analogy to other securities act provisions under which private rights of action have been implied. It seems to me, however, that the issue is rather whether a private action at law for *damages* should be implied. With reference to that issue, I think that the Investment Advisers Act differs significantly from the securities statutes upon which the majority draws for support.

The legislative history of the Advisers Act indicates that it was a tentative attempt to effect a "compulsory census" of investment advisers by requiring registration rather than to provide a full regulatory scheme. David Schenker, representing the SEC, testified in the Senate Hearings:

Therefore, our fundamental approach to this problem is in the first instance, before we could intelligently make an appraisal of the economic function or of the abuses which might exist in that type of organization, to see if we could not get something which approximated *a compulsory census. Fundamentally that is the basic approach of title 2.* [The Advisers Act]. We first would like to find out how many people are engaged in this business, what their connections are, what is the

---

28. The cut-off price for such unregistered securities in the portfolio at the time plaintiffs withdrew should be the value assigned to such securities by the general partners, since that presumably is what plaintiffs received. This would provide the closing out price for loss-netting purposes with respect to securities remaining in the portfolio at the time of plaintiffs' withdrawal.

1. The Hedge Fund partnership agreement gave the general partners the following powers:

"(a) To purchase, hold and sell stocks, bonds and other securities; (b) to sell stocks, bonds and other securities short and to cover such sales; (c) to purchase, hold, sell and otherwise deal in put and call options and any combination or combinations thereof; (d) to purchase, hold, sell, sell short and cover, and borrow from brokers for that purpose, commodity contracts and to purchase, hold, sell and otherwise deal in commodities generally dealt in on commodity or produce exchanges, provided, however, that Partnership funds used for the purpose of dealing in commodities and commodity contracts shall not exceed at the time of any purchase or commitment ten (10) percent of the net worth of the Partnership at July 1, 1965 or at the beginning of any calendar year thereafter, as the case may be; (e) to conduct margin accounts with brokers; (f) to open, maintain and close bank accounts; (g) to sign checks; (h) to pledge securities for loans; (i) to engage in the business of advising and counselling on investments and to enter into agreements therefor; and (j) generally, to act for the Partnership in all matters incidental to the foregoing."

The original partnership agreement was amended twice, but the amendments did not affect the management's broad discretionary powers.

extent of their authority, what is their background, who they are, and how they handle the people's funds" (emphasis added).

*Hearings on S. 3580 before the Subcomm. of the Senate Comm. on Banking & Currency,* 76 Cong., 3d Session 48. *See also* S.Rep. No. 1760, 86th Cong., 2d Sess., U.S.Code Cong. & Adm.News 1960, p. 3502. There are other indications that "as enacted, the Investment Advisers Act represented a compromise between the SEC and the investment advisory industry." *See Note, Private Causes of Action Under Section 206 of the Investment Advisers Act,* 74 Mich.L. Rev. 308, 319–30 & n.69 (1975).[2] It is in light of this cautious approach taken by Congress in enacting the Advisers Act as tentative legislation that Section 214, the provision which appears to allow only suits in equity, should be read.

Section 214 is unlike the corresponding sections in the other Acts. As my Brother Timbers notes, the Advisers Act gives the district courts jurisdiction, concurrently with state courts, only "of all suits in equity to enjoin any violation of this subchapter or the rules, regulations, or orders thereunder." The other Acts, by contrast, provide jurisdiction not merely over "all suits in equity," but also over "actions at law brought to enforce any liability or duty created thereby, or to enjoin any violation of this subchapter, or the rules, regulations or orders thereunder," *e. g.,* Investment Company Act of 1940, § 44, 15 U.S.C. § 80a–43, an act passed together with the Advisers Act in a single bill.[3] For similar language in other Acts, *see* majority opinion p. 874, n.20.[4]

The attempted withholding of jurisdiction over actions at law in the Advisers Act indicates that Congress was not intending to provide for *any* liability beyond injunctive relief.[5] As Mr. Justice Powell noted in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44

**2.** See p. 880 & n. 3 infra.

**3.** It seems to me of some significance that early drafts of the Advisers Act, including S. 3580 and H.R. 8935, filed on March 14, 1940, merely incorporated by reference § 40 of the Investment Companies Act, which did include the reference to "actions at law." After the conclusion of four weeks of Senate hearings on April 26, however, representatives of the industry met with the SEC to negotiate changes in the proposed bill. *See Hearings on H.R. 10065 Before a Subcomm. of the House Comm. on Interstate and Foreign Commerce,* 76th Cong., 3d Sess. 72 (1940); 86 Cong.Rec. 10069 (1940) (remarks of Senator Wagner). The result was a new draft, which finally met the approval of the industry, *see House Hearings* at 95; Jaretski, *The Investment Company Act of 1940,* 26 Wash.L.Rev. 303, 309–10 (1941), and which for the first time contained a separate jurisdictional provision referring to "suits in equity" but omitting the reference to "actions at law" which the majority seeks to restore to the statute.

**4.** While the majority opinion does not rely on the circumstance that jurisdiction is conferred over "violations" of the statute and rules thereunder to imply a cause of action for damages at law, a district court has done so. *See Bolger v. Laventhol, Krekstein, Horwath & Horwath,* 381 F.Supp. 260 (S.D.N.Y.1974). I do not agree. "Violations" in the context means criminal violations, and violations on the civil side are limited to suits in equity. This is made clear by the venue provisions of § 214: (1) "any criminal proceeding" may be brought in the district court wherein any act or transaction constituting the violation occurred; (2) "any suit or action to enjoin any violation . . . may be brought in . . . ." There is still no reference to an "action at law."

**5.** One might indeed argue that there is lack of subject-matter *jurisdiction* to enforce actions at law for damages for violations of the Advisers Act because of the lack of any specific statutory authorization, but I do not urge that. There is jurisdiction under a broad reading of the "arising under" clause of 28 U.S.C. § 1331. *Cf. Illinois v. City of Milwaukee,* 406 U.S. 91, 98, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972); *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 393, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959) (Brennan, *J.,* concurring and dissenting); *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). *See also Tunstall v. Brotherhood of Firemen,* 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944) ("arising under" 28 U.S.C. § 1337). The majority correctly states that plaintiffs allege jurisdiction under § 214 of the Advisers Act, the very section that does *not* provide for "actions at law," but since the pleading can be amended I make no point of the insufficiency of a proper jurisdictional statement. Even if an implied claim for relief is judge-made, it may "arise under the laws of the United States."

L.Ed.2d 539 (concurring), "[t]he starting point in every case involving construction of a statute is the language itself." The majority opinion explains that the language of § 214 differs from the language of the jurisdictional sections in every other Securities Act because "each of the other Aćts whose jurisdictional provisions refer to 'actions at law' contains one or more sections *expressly* granting injured parties a private right of action for damages,'" and hence, required the jurisdictional provision for that reason.[6]

But the more cogent question is why the Advisers Act, as distinguished from every other securities act, does not provide for *any express* civil liability in damages. The majority offers no explanation for such an omission which must have been a studied omission. I think it is highly relevant that in *each* of the other Acts Congress itself did provide for some *express* civil liability, yet under the Advisers Act it failed to include a single section imposing liability for damages. Congress, for example, could have

provided an express damage remedy for misrepresentations in the registration statement of the advisers as it did for misrepresentations of the registration statement of the underwriter, 15 U.S.C. § 77k(a)(5). This indicates rather that, in its cautious approach to the regulation of investment advisers, Congress was not yet ready to impose *any* civil liability for damages.

The majority holds, nonetheless, that a private damage action should be implied in this case "to implement the statute's underlying purposes." It notes that persons relying upon investment advisers for advice, for whose "especial benefit" the Act was adopted, *see Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 416 (1975), will benefit from a private damage action. *Ante,* pp. 872–873 *citing SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186–91, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).[7] Such reasoning it seems to me has become somewhat outmoded in the light of the current standards of interpretation announced in *Cort v. Ash, supra.* The *four* factors men-

**6.** The reason given by the majority is not persuasive, for its fails to note that in every single case in which an express civil liability is created in *any* of the Acts, the jurisdiction has *already* been stated in the very section creating the express liability. Thus, § 11 of the 1933 Act, 15 U.S.C. § 77k, *itself* provides that "any person acquiring such security . . . may, either at law or in equity, in any court of competent jurisdiction, sue . . . ." Section 12 of the 1933 Act, 15 U.S.C. § 77*l, itself* provides that the purchaser "may sue either at law or in equity in any court of competent jurisdiction . . . ." To the same effect, *see* Section 9(e) of the 1934 Act, 15 U.S.C. § 78i(e); Section 16(b) of the 1934 Act, 15 U.S.C. § 78p(b); Section 18 of the 1934 Act, 15 U.S.C. § 78r; Section 16(b) of the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79p(b); Section 17(b) of that Act, 15 U.S.C. § 79q(b); Section 323(a) of the Trust Indentures Act, 15 U.S.C. § 77www(a); Section 30(f) of the Investment Companies Act, 15 U.S.C. § 80a–29(f). The better explanation, it seems to me, for the general jurisdictional provision in each Act—"the District Courts of the United States . . . shall have jurisdiction" etc.—is Congress' fear that general federal question jurisdiction under 28 U.S.C. § 1331 might not establish jurisdiction in the *federal* courts over securities law claims, particularly when the jurisdictional amount was lacking. The separate jurisdictional provisions associated with the several sections of the securities acts creating substan-

tive liability referred only to "any court of competent jurisdiction," and hence left open the question of whether the federal courts were in fact courts of "competent jurisdiction." Thus, an independent jurisdiction was conferred on the federal courts by the general provision of each statute (and in the case of the Securities Exchange Act, exclusive jurisdiction). In short, the internal sections conferred general jurisdiction. The jurisdictional section was drawn as broadly as possible to confer clear *federal* jurisdiction.

The majority opinion seeks to draw support from the fact that the Senate and House Reports stated that the enforcement provisions of the Advisers Act were "generally comparable" to those of the Investment Companies Act. *Ante* at 875. Aside from the fact that this begs the crucial question—whether the Acts were comparable in this particular respect—it ignores what was in my view the more likely meaning of "generally comparable" as applied to the enforcement provisions: that is, that the Advisers Act is "generally comparable" to the Investment Company Act in that both provide for the concurrent jurisdiction of state and federal courts, as distinguished from the Exchange Act in which federal jurisdiction is made exclusive.

**7.** That case was not, of course, a damage action, nor was it brought by a private party.

tioned in *Cort v. Ash* are not mere surplusage to the theme that the beneficent purpose of the legislation is, by itself, sufficient warrant for the implication of a claim for private relief.[8] Such a single criterion is also inadequate because a statute can have more than one "beneficent purpose"—here, to protect investors but also to avoid undue disruption of the investment advisory industry. To put it another way, Congress may intend a statute to protect investors—but not necessarily without limit. Countervailing considerations may result in something less than an imposition of civil liability for money damages. The majority opinion ignores this problem of statutory construction, in my view, because it gives insufficient weight to the second factor listed in *Cort*: "is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?"[9] As shown above, there *is* implicit legislative intent to deny such a remedy.[10]

The majority urges that there is no evidence that Congress intentionally sought to preclude private damage actions. *Ante*, p. 874. But there is surely no "clear evidence" that Congress affirmatively intended private actions for damages to lie for violation of § 206. And we have been in-

structed recently in *National Railroad Passenger Corp. v. National Ass'n of Railroad Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974) (*"Amtrak"*) that " 'when a statute limits a thing to be done in a particular mode, it includes the negative of any other mode,' " *quoting Botany Mills v. United States*, 278 U.S. 282, 289, 49 S.Ct. 129, 72 L.Ed. 730 (1929). Section 214 expressly confers jurisdiction over suits in equity only, and the Act as a whole does not provide anywhere for actions at law. Under the *Amtrak* formulation, when Congress limits relief to equitable relief, "it includes the negative of any other mode"— monetary liability. In *Amtrak* Mr. Justice Stewart observed that, in determining whether a private action would lie, this rule of statutory construction should yield only "to clear contrary evidence of legislative intent," 414 U.S. at 458, 94 S.Ct. at 693, a situation that does not exist in the case of the Advisers Act.

Similarly, in *Securities Investor Protection Corp. v. Barbour* (*"SIPC"*), 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975), Mr. Justice Marshall noted that where there is express statutory provision for one form of proceeding, this "ordinarily implies that

8. The majority reasons that Section 215(b) of the Advisers Act, 15 U.S.C. § 80b–15(b) (1970), which provides that any contract violating the Act shall be void, strongly suggests that a private remedy should be implied. *Ante*, p. 874, *supra*. But it does violence to the criteria enunciated in *Cort* to imply an action simply because a contract is made void, or to recognize an actionable tort, simply because a statute prohibits particular conduct. *Cf.* Note, *Section 206 Private Actions*, 74 Mich.L.Rev. 308, 312 n.19 (1975). Significantly, the SEC in its *amicus* brief does not rely on § 215(b) of the Act.

Even if the fact that a statute renders certain contracts void were deemed *ipso facto* to create a private right of action, on the theory that this provision could be vindicated only by the private parties to the contract, it of course by no means follows that a *damage* remedy is proper. Rescission or restitution are, aside from damages, remedies ordinarily available when a contract is void. Significantly, rescission is an equitable remedy, *see* 5 Corbin on Contracts § 1103, so that implication of a private right of action for rescission and restitution under § 215(b) would be well within the

jurisdictional grant of § 214, and consistent with the notion that it is only *actions at law* which are inconsistent with the statutory scheme.

9. Analytically, it would be equally proper to say that implication of a private action under the Advisers Act is not "consistent with the underlying purposes of the legislative scheme." *Cort, supra*, 422 U.S. at 78, 95 S.Ct. at 2088. For though such a remedy may be consistent with the goal of protecting customers of investment advisers, it is hardly consistent with the desire not to subject advisers to monetary liability, at least, until further study by Congress.

10. The situation in which there is express statutory provision for one form of proceeding, as here, for equitable but not legal actions, should be distinguished from the situation in which Congress gives broad but unspecified remedial scope to the statute, *see, e. g.,* § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b). In the latter situation, implication of some private actions may be not merely consistent with the legislative purpose, but necessary in order fully to effectuate it.

no other means of enforcement was intended by the Legislature," 421 U.S. at 419, 95 S.Ct. at 1738, again emphasizing that the implication would yield only to "clear contrary evidence of legislative intent." I think that my brothers turn this test backwards. And as we have seen, there are strong reasons for believing that not only is there no "clear contrary evidence of legislative intent" but rather that whatever evidence exists looks the other way.

That a statute explicitly provides for private rights of actions in some sections does not, of course, preclude the implication of other actions under different sections of the same Act. *J. I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *see* 6 L. Loss, *Securities Regulation,* 3869–73 (Supp.1969). *Cf.* 1 A. Bromberg, *Securities Law: Fraud* § 2.4(1) (1975); *Note, Private Rights of Action Under Amtrak and Ash: Some Implications for Implication,* 123 U.Pa.L.Rev. 1392, 1419–20 (1975).[11] But the Advisers Act is a statute which completely omits *any* damage actions whatever, even though *otherwise analogous statutes* do not. To find a negative implication in such a case is more than a mechanical rule of construction. For while under the Securities Act the failure to include express remedies for each substantive section probably is due to considerations not relevant to the implication question, *see Note, supra,* 123 U.Pa.L.Rev. at 1419–20, the failure to include *any* provision for damage remedies in the Advisers Act is best explained by reasons of policy which Congress deemed sound, and which would actually be undermined by the implication of a private damage action.

The Advisers Act was passed in 1940, almost four decades ago. It was designed as a threshold attempt to effect a compulsory census of investment advisers, and not as a pervasive regulatory scheme. In all these years no litigant has urged to a Court of Appeals that Section 206 of the Act is a basis for a private damage action.[12] The majority opinion suggests that when the Act first became law in 1940, Congress gave no thought to the possibility of a private right of action against investment advisers, and finds this to be an argument in favor of implication, as we have seen. The court ignores the circumstance, however, that when Congress passed the 1970 amendments, Public Law No. 91–547, 84 Stat. 1413, it specifically addressed itself to the civil liability of investment advisers. When it did, it limited that liability (a) to investment advisers who advise *investment companies* and no others, and (b) only to the extent of a breach of fiduciary duty concerning compensation for services or like payments. Investment Company Act § 36, 15 U.S.C. § 80a–35. *See Galfand v. Chestnutt Corp.,* 545 F.2d 807 (2d Cir. 1976). The implication is clear that Congress did give specific attention to investment advisers, but decided not to impose civil liability on those investment advisers who were not advisers to investment companies.

It is significant also, I think, that when Congress made a thoroughgoing revision of the Advisers Act in 1960, it failed to create a single express liability nor did it amend Section 214 to include actions at law.[13]

11. In *Borak,* the Court relied not only on § 27's provision for "actions at law" but also on its language "brought to enforce any liability or duty created" under the Act. The Court specifically referred to *Deckert v. Independence Shares Corp.,* 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940), which had emphasized the same language in Section 22(a) of the 1933 Act, 15 U.S.C. § 77v(a), "to enforce any liability or duty created by this subchapter." The *Deckert* Court added: "The power to enforce implies the power to make effective the right of recovery *afforded by the Act.*" 311 U.S. at 288, 61 S.Ct. at 233. (Emphasis added).

12. The issue was tendered but not passed upon in *Brouk v. Managed Funds, Inc.,* 286 F.2d 901 (8th Cir. 1961), *vacated as moot,* 369 U.S. 424, 82 S.Ct. 878, 8 L.Ed.2d 6 (1962). In his monumental treatise, Professor Loss does not even mention the possibility of a private damage action under § 206. He does indicate that § 215(b) is "relevant" to the question of civil liability, but concludes that there has been "no significant litigation." *See* L. Loss, *Securities Regulation* 1757 (1961 ed.); *id.* at 3864–65 (Supp.1969).

13. When Congress expanded the scope of the Act in 1960, it did not alter the statutory scheme. Instead, it strengthened the enforce-

And in the 1970 amendments, Congress indicated that when it wanted to do so, it expanded the statutory relief available in the companion Investment Company Act, § 36, 15 U.S.C. § 80a–35, by providing that a court may "award such injunctive *or other relief.*" "Other relief" was added. *See Moses v. Burgin,* 1 Cir., 445 F.2d 369, 373 n.7. In addition, the recently concluded Congress had before it an amendment proposed by the Securities and Exchange Commission providing for a private damage action under the Advisers Act. It does not appear seemly to me, unless we are under an absolute compulsion to do so, suddenly to create such a claim for relief by judicial legislation, without the ability to define the outer limits of such a claim.

Congress is uniquely able to set the limits of any civil action for damages. That this is so is emphasized by the majority opinion on this very appeal. It holds that the 10b–5 claim is without merit, yet on the *same* factual allegations it supports a § 206 claim. In so doing, it circumvents the sound policies behind the restrictions on 10b–5 claims.

Thus, for example, the 10b claim is held to have been properly dismissed because, as my brother Timbers tells us:

> "They [plaintiffs] say that they would have withdrawn from the firm in 1968 if defendants had not misrepresented the true nature of the firm's investment at that time. The short answer to this branch of plaintiff's argument is that the requirement of fraud in connection with the purchase or sale of a security is not satisfied by an allegation that plaintiffs were induced fraudulently *not* to sell their securities. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 737–38, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)" page 868 (emphasis in original).

I am not sure that *Blue Chip* is so limited in its application. I think that the underlying concern in *Blue Chip,* though standing was involved, was not the lack of a technical "purchase or sale," which ingenuity might have supplied, *see* 9 Cir., 492 F.2d 136, but, perhaps, the sheer inability to disprove what a plaintiff says he *would have* done if he had but known the truth. This problem is as acute in suing investment advisers as in suing offerors, perhaps even more acute in the former situation. There is a distinct danger that, by implying an open-ended private right of action, the court is giving the clients of investment advisers *carte blanche* to convert themselves from victims to defrauders. Judge Hufstedler said it well in her excellent dissenting opinion below in *Blue Chip Stamps,* 492 F.2d at 148:

> "The passive investor could always await market developments without any risk, claiming deception caused nonbuying if the value of the securities proved more promising than the offeror's glum predictions and deception caused nonselling if a rosier prospectus was followed by a market decline."

In this very case the plaintiffs received profits from the restricted letter stock and waited almost a full year until the market became unfavorable before seeking redemption of their shares.[14] They deliberately entered into a partnership that was going to operate in the most speculative of investment activities. They gave the general partners the power to invest in any kind of security, to sell short and cover both securities and commodities, to buy and sell options and to cover, to play the commodities market, to buy on margin, to lend money to

---

ment powers of the SEC, *see* S.Rep. No. 1760, 86th Cong., 2d Sess. 2, 4 (1960). Pub.L. No. 86–750, §§ 2–6, 74 Stat. 885, *amending* §§ 203–04, 15 U.S.C. § 80b–3, –4. Moreover, the *Commission* was given the power to obtain injunctive relief against aiders and abettors as well as principal violators. *Id.* at § 12. Section 206 itself was amended to apply to unregistered as well as registered advisers. *Id.* at § 8. Suffice it to say that Congress was aware of the problems of enforcement and that it dealt with the

problem as it saw fit. It is not for the courts to decide that this remedial scheme is still insufficient.

14. Between the end of 1969 and September 30, 1970, the New York Stock Exchange composite index fell over 10%; the Dow Jones industrial average fell over 5%. Even if the hedge fund had invested in the most conservative blue-chip portfolios, therefore, plaintiffs would have suffered losses for the period.

partners without security, and to pledge partnership assets for loans. *See* note 1, *supra.* Even a babe in the woods would know that he was giving his money to the general partners for discretionary speculation. The purchase of unregistered stock, far from being unforeseeable, fits quite well into this plan. For, in a rising market, well-selected investment letter stock can prove profitable, and established investment bankers handle such securities on an "investment letter" basis. Given the purposes of the hedge fund and the broad powers vested in the general partners, it is hardly likely that the plaintiffs were interested in evaluating the portfolio themselves. Indeed, the plaintiffs never asked for a list of the securities held by the partnership.

The complaint does not allege self-dealing, conflict of interest, or conversion of assets, any of which would be actionable under § 10(b), if in connection with the purchase or sale of securities. *See, e. g., Bird v. Ferry,* 497 F.2d 112 (5th Cir. 1974) (conversion by salesman). To the contrary, it shows that defendants themselves invested their own money and the money of their families, and there is no allegation that they withdrew it. The plaintiffs prospered under this management for a considerable time when the market was good, reaping profits from the investment of unregistered securities—letter stock as well as other securities in the common portfolio. Having joined the partnership as early as 1965, they undoubtedly basked in the euphoria of the bull market described by Judge Friendly in *Levine v. Seilon, Inc.,* 439 F.2d 328, 335 (2d Cir. 1971). Conversely, however, when the market turned down, it turned down for all including the defendants.[15]

This practical consideration indicates to me, not, as it is suggested in the majority opinion, that the plaintiffs should not be given a chance to prove their case, *see* footnote 22a, but that, in the absence of a legislative determination of the policy questions involved, we are treading on dangerous ground in implying a private action under § 206 on the fact pattern alleged here, and ought instead to leave the issue to Congress. To create an analogue to Section 10(b) without the requirement that the "fraud" be "in connection with the purchase or sale" of a security hardly gives broad effect to the policy considerations so clearly expressed in the majority opinion of the Supreme Court in *Blue Chip Stamps* and in Mr. Justice Powell's concurring opinion, as well as Judge Hufstedler's dissent in the Court of Appeals. The majority specifies no limits to the civil liability under § 206 which it is in the process of creating over this dissent. Yet, it is simply extending 10b–5 by resort to a different statute. As the Court said in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 1389, 47 L.Ed.2d 668 (1976), "We would be unwilling to bring about this result absent substantial support in the legislative history, and there is none." We do not know, if Congress creates an express private cause of action for damages under § 206, that it will not limit the right as it did with respect to § 10(b), by imposing a purchase or sale requirement, and perhaps also by defining the measure of damages and enacting a separate statute of limitations.[16]

---

**15.** The majority opinion assumes that when plaintiffs discovered the "misrepresentation" they could wait until the following year to see how the market would go, because their redemption right was restricted to redemption at particular stated times. But with all respect that simply does not follow. When a person discovers that he has been defrauded, he may sue *at once* for rescission or damages, regardless of the contractual restriction. *See* Prosser on Torts § 105, at 689 (4th ed. 1971); Restatement [First] of Torts § 549 note *e* (1938). The contrary rule would substantially undermine congressional policy. As the court said in *Roy-*

*al Air Properties, Inc. v. Smith,* 312 F.2d 210, 213–14 (9th Cir. 1962): "The purpose of the Securities Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act."

**16.** The SEC, for whose excellent work I have the highest admiration, has been rebuffed by the Supreme Court in its attempt to repeal the requirement of "in connection with the purchase or sale of a security." *See Blue Chip Stamps, supra,* 421 U.S. at 732, 95 S.Ct. 1917. It has also been rebuffed by this court, *see*

The Commission, in its *amicus* brief, argues for an implied civil right of action for damages, on the ground that "the claim asserted by plaintiffs herein is not one that would test the *outer limits* of the cause of action created by the antifraud provisions of the federal securities laws." (Emphasis added). But what *are* the limits to what is essentially a Rule 10b–5 action, if not the prerequisite that the claim relate to the "purchase or sale of a security"? Implying a claim for relief without limitation will encourage actions against investment advisers for poor judgment, disguised by pleadings subtly implying fraud and deceit. The unfounded allegation itself, contrary to the solicitude originally expressed by the SEC itself, will spell grief for the investment adviser, and the expense of defending the action will often compel settlement.[17] Each

consideration is a policy ground that should be weighed. *See Blue Chip Stamps, SIPC,* and *Amtrak.* Indeed, in its early days the SEC itself was vitally concerned with these considerations militating against public disclosure.[18] This belies any intention by Congress to open wide private civil complaints which, in the nature of our adversary proceedings, become public property at once.

The blackmail effect of allowing customers to sue investment advisers for damages for what the customer might have done if he had but known, seems obvious for the reasons so well stated by Mr. Justice Marshall. The customer has ample relief under § 10(b), for misrepresentations made by the investment advisers in the process of getting him into the adviser's fund.[19] And if Congress wishes to go further, it can do so.

*Levine v. Seilon,* 439 F.2d 328, 329 (2d Cir. 1971). And in the *Blue Chips Stamps* case, Mr. Justice Powell commented that the SEC had "joined, surprisingly" in urging expansion. of the statute. 421 U.S. at 759, 95 S.Ct. 1917.

17. Mr. Justice Rehnquist in *Blue Chip Stamps,* 421 U.S. at 740, 95 S.Ct. at 1927, stated that it was a policy concern that "even a complaint which by objective standards has very little chance of success at trial has a settlement value to the plaintiff out of any proportion to its prospect of success at trial so long as he may prevent the suit from being resolved against him by dismissal or summary judgment." And Mr. Justice Powell considered that "allowing this type of open-ended litigation would itself be an invitation to fraud." 421 U.S. at 761, 95 S.Ct. at 1937.

Similarly, in *Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975), Mr. Justice Marshall noted that "except with respect to the solidest of houses, the mere filing of an action predicated upon allegations of financial insecurity might often prove fatal." 421 U.S. at 422, 95 S.Ct. at 1739. He added: "These consequences are too grave, and when unnecessary, too inimical to the purposes of the Act, for the Court to impute to Congress an intent to grant to every member of the investing public control over their occurrence." *Id.* at 423, 95 S.Ct. at 1740.

18. How strikingly similar was the explanation by the SEC representative to the House of the provisions of § 210:

"The only other provision of consequence is section 210, which in our opinion will have a very salutary effect. The investment counsels were a little concerned about the effect on their business if it got around that the

Securities and Exchange Commission was conducting an investigation. In order to safeguard against this danger section 210(a) and (b) provide that there shall not be any disclosure of any investigation by the Securities and Exchange Commission until it has made up its mind that a public hearing is to be held. Then in order to safeguard them further, subsection (c), provides that the Commission can not ask these investment counsellors to disclose their clients, and what their investments are, except if there is some indication of wrongdoing. Thereafter, in connection with the investigation, they have to make the disclosure."

*Hearings on H.R. 10065 before the Subcomm. of the House Comm. on Interstate and Foreign Commerce,* 76th Cong., 3d Sess. 138 (1940); see also *Senate Hearings, supra,* at 713, 715.

19. The Commission in its *amicus* brief asserts that "this private action undeniably could be maintained [on the basis of § 10(b)] alone." This is contrary to our unanimous holding on this appeal. But we all agree that in proper circumstances, investment advisers are as liable as any other persons under § 10(b). *Cf. Superintendent of Insurance v. Bankers Life & Cas. Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* CCH Fed.Sec.L.Rptr. ¶ 95,660 (2d Cir., July 15, 1976); *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 495 F.2d 228 (2d Cir. 1974). This fortifies the argument that there is no need for an additional judicially created remedy against advisers where the purchase or sale of securities is involved.

Since my brethren wish to create a new implied right of action, I have given my reasons for dissenting from their view. As indicated, I concur in the dismissal of the § 10(b) claim, but would carry over some of the reasoning to dismiss the asserted claim under § 206 as well.